EXHIBIT G

This option agreement sets forth the respective rights and obligations arising in connection with any option transaction by you (Robinhood Financial LLC and Robinhood Securities, LLC) on my behalf including but not limited to, the purchase and sale of put and call options:

1. I wish to commit a portion of my funds to trading in options. I consider myself sophisticated in investment matters and am able to read and understand confirmation and monthly statements. I realize and understand that any form of option trading has a number of risks connected therewith. I understand that the risk associated with option trading is extremely high, and in maintaining an option account and engaging in option trading, I am engaging in transactions of a speculative nature. In investing in an option contract, I am speculating that the price of the underlying security will not only move in the direction which I anticipate (i.e. the price will move up in the case of a call option and move down in the case of a put option), but that the price move of the underlying security will also exceed the premium which I pay for the option, commissions and other transaction costs. Thus, if the price movement is not sufficient, I could lose my entire investment in the option contract. If I write an option contract without depositing or owning the underlying security, I realize that my risk of loss is potentially unlimited. Notwithstanding this risk of loss I agree to honor all assignments and deliver to you the underlying security in the prescribed time, and if I fail to deliver the underlying security in the proper time, I designate you to act as my agent and buy in such stock at the current market price so that I may honor my commitment to deliver. I understand that my account will be debited for any loss and that you will charge me a commission and a fee for this service. I have sufficient income and other assets to sustain this risk inherent in such investments.

2. I am aware of the high degree of risk involved in options transactions and have provided information to demonstrate that this account and the trading anticipated in connection therewith is not unsuitable for me in light of my investment objectives, financial situation and needs, experience and knowledge. I agree to advise you of any changes in my investment objectives, financial situation or other circumstances that may be deemed to materially affect the suitability of executing options transactions for my account.

3. I will read the disclosure document entitled the *Characteristics and Risks of Standardized Options* available through Robinhood Financial LLC or www.theocc.com, and any supplement thereto. I agree you shall not be held liable for risks such as those disclosed therein, including risks in connection with the execution, handling, purchasing, selling, and exercising of options for my account.

4. Any decisions I make to enter into options transactions are entirely my own, and are made without any investment advice from you.

5. I agree to abide by all rules of the Options Clearing Corporation ("OCC"), or any securities exchange rules governing option transactions, including but not limited to position and exercise limit rules. Under the position limit rules, unless some different provision has been made by the OCC for a particular stock, no single investor or a group of investors acting in concert (regardless of whether the options are held in one or more accounts or through one or more brokers) may

hold more than the allowable number of option contracts covering the same underlying stock or index on the CBOE or Amex, etc. Under the exercise limit rules, unless otherwise determined and announced by the OCC, no investor or group of investors acting in concert, within any five consecutive business days, may exercise more than the allowable number of options covering the same underlying security or index. The number of allowable contracts varies widely for different equity and index options.

6. Where I am long an option which is about to expire in the money, you are authorized, in your sole discretion and without notification to me, to exercise the option and liquidate the underlying stocks for my account, using your best efforts. This is in no way to be construed as an obligation on your part to sell or exercise such option on behalf of my account, and I therefore waive any and all claims for damages or loss which I may incur at any time against you arising out of the fact that any option in my account(s) was not exercised, unless I instructed you to do so.

7. There are special risks associated with uncovered option writing that expose the investor to potentially significant and/or unlimited losses. Therefore, this type of strategy may not be suitable for all customers approved for options transactions.

8. I am aware of RHS's requirements and time limitations for accepting an exercise notice and expiration date. I understand that I may not receive actual notice of exercise until the week following exercise. I bear full responsibility for taking action to exercise or sell valuable options; however, in the absence of my notifying you to exercise a valuable options contract by 3 p.m. Central Standard Time on the last business day prior to the expiration date of the options contract, I agree that RHS may exercise the options contract on my behalf. In the event of such exercise, the profit in excess of commission costs created thereby will be credited to my account. If I do not instruct you to exercise the valuable option by the time stated above, I waives any and all claims for damage or loss arising out of the fact that the option was not exercised. I understand that RHS utilizes a random method of allocation for all option(s) assignments received from the Option Clearing Corporation. Exercise assignment notices for options contracts are allocated among all customers' short positions within that series. This is accomplished by a manual procedure, which randomly selects from among all customer short positions, including positions established on the day of assignment, those contracts which are subject to exercise. All American short positions are liable for assignment at any time. I understand that a more detailed description of this procedure is available upon request.

9. I agree to maintain in my account(s) with you such margin as you deem necessary or advisable, which may be changed by you from time to time, for the protection of your position as endorser of option contracts issued pursuant to my orders, and to respond to any and all margin calls issued by you in connection with such account(s). If I fail to comply with your margin calls you are authorized, in your discretion and without notification to me, to take such action as you may deem appropriate to protect the position and obligation which you may have assumed at my request. This authorization is intended to include (without limitation thereby) the purchase and sale for my account, and risk of, any part or all of the shares represented by options endorsed by you at my request, and the purchase for my account, and risk of, such additional puts and calls as

you may deem necessary to fully protect yourselves. Any securities and funds held by you in any account of mine with you shall be held by you as collateral for the performance by me of my obligation to you under this agreement.

10. I hereby authorize RHS in its discretion, should RHS deem it necessary for RHS's protection for any reason, including the account holder's death, to buy, sell, or sell short for the account any risk, puts, calls or other forms of option and/or to buy, sell or sell short any part or all of the underlying shares represented by options endorsed by RHS for my account. I will reimburse any and all expenses incurred by RHS in connection with such transactions shall be reimbursed. I understand that when transactions on my behalf are to be executed and the options are traded in more than one marketplace RHS may use its discretion in selecting the market in which to enter the order. All monies, securities, or other property which RHS may hold in my account shall be held subject to a general lien for the discharge of my obligations to RHS under this agreement or otherwise.

11. This agreement is supplementary to a Margin Agreement simultaneously or heretofore entered into between us and shall in no event be deemed to abrogate or in any other way diminish any of your rights under the Margin Agreement; provided, however, that in the event of any conflict between the terms of this agreement and the terms of the Margin Agreement, the provisions of this agreement shall prevail.

12. You shall not be liable for loss caused directly or indirectly by government restriction, exchange or market rulings, war, strikes, or any other conditions beyond your control.

13. The provisions of this agreement shall apply to all put options, call options, or other options which may have been previously purchased, sold, executed, handled, endorsed or carried for my account(s) and shall also apply to all put options, call options or other options which you may hereafter purchase, sell, handle, endorse or carry for my account(s) and shall inure to your benefit.

14. You are under no obligation to convey to me any information relating to the underlying securities covered by any options in my account(s) or any securities related thereto, or any information relating to the option, whether such information is then or thereafter known or available. I understand that any information or notification in respect to any option or any underlying securities or securities related thereto which you may give me and which you are not required to give by the terms of this agreement, express or implied, shall not be construed as creating an implied agreement or course of dealing between us and shall not impair the provisions of this or any other agreement between us.

15. AGREEMENT TO ARBITRATE ALL CONTROVERSIES. I agree, and by carrying my account you agree, that all controversies which may arise between us, including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this agreement shall be concluded before the New York Stock Exchange, Inc. ("NYSE") or the Financial Industry Regulatory Authority ("FINRA"), and in accordance with its rules then in force. I may elect in the first instance whether

arbitration shall be conducted before the NYSE or the FINRA, but if I fail to make such election, by registered letter addressed to you at your main office, before the expiration of five days after receipt of a written request from you to make such election, then you may make such election. Judgment upon the award of arbitrators may be entered in any court, state or federal, having jurisdiction. I represent that I understand the terms of the arbitration clause, as follows:

(a) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

(b) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

(c) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

(d) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.

(e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

(f) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

(g) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

16. Class-action matters are excluded from arbitration proceedings conducted by the FINRA. Therefore, it is further agreed that the parties to this agreement shall not bring a putative or certified class-action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class-action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until; (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

17. Unless I give specific instructions as to where to direct orders, I hereby authorize you to select the exchange or market to which my orders are directed.

18. I understand that my options account is subject to further review and acceptance. Transactions in my account made prior to such review and acceptance are valid transactions, notwithstanding future restrictions or limitations you may place on my account.

19. I will not hold you responsible for the availability, accuracy, timeliness, completeness, or security

of trading securities through Robinhood's platform. I therefore agree that you are not responsible for any losses I incur (meaning claims, damages, actions, demands, investment losses, or other losses, as well as any costs, charges, attorneys' fees, or other fees and expenses) in relation to this functionality. Furthermore, I shall be responsible for all expenses incurred by you, including reasonable attorneys' fees in enforcing any provision of or collecting any amounts due you under this agreement.

20. By completing and submitting this agreement, I am applying to receive from Robinhood Financial LLC ("Vendor") a market data service (the "Service") providing access to current options last sale and quotation information and related information ("OPRA Data") published by OPRA pursuant to a Plan declared effective by the Securities and Exchange Commission. The parties to this Plan (each, an "OPRA Participant") are those national securities exchanges that are from time to time approved by the Securities and Exchange Commission for the trading of securities options. In reviewing and approving this agreement, Robinhood Financial LLC is authorized to act on behalf of OPRA. The person who acts from time to time as data processor on behalf of OPRA is referred to herein as "OPRA's Processor."

21. By completing and submitting this agreement, I am consenting to enter into this agreement in electronic form. I have the right to withdraw my consent by terminating this agreement and my receipt of the OPRA Data. My right to terminate this agreement and my receipt of the OPRA Data, and the procedure I must follow to do so, are described in paragraph 30 below. If any information needed to contact me electronically changes, I understand the procedure for notifying Vendor described in this agreement. I understand may access a copy of this agreement electronically at no charge by visiting Vendor's Disclosure Library at https://about.robinhood.com/legal.

22. I hereby represent and agree that (a) my full name and address are maintained up-to-date in your brokerage account with Vendor; (b) I shall receive the Service and the OPRA Data included therein solely for my own personal use, and I shall not retransmit or otherwise furnish the OPRA Data to any person; (c) I am only permitted under this agreement to use the OPRA Data for the investment activities described in paragraph 31(b) below; and (d) I acknowledge that OPRA Data is and shall remain the property of the OPRA Participant on which a reported transaction took place or a reported quotation was entered.

23. DISCLAIMER OF LIABILITY: NEITHER VENDOR, OPRA, OPRA'S PROCESSOR NOR ANY OPRA PARTICIPANT GUARANTEES THE TIMELINESS, SEQUENCE, ACCURACY OR COMPLETENESS OF ANY OF THE OPRA DATA SUPPLIED HEREUNDER AND NEITHER VENDOR, OPRA, OPRA'S PROCESSOR NOR ANY OPRA PARTICIPANT SHALL BE LIABLE IN ANY WAY, TO YOU OR TO ANY OTHER PERSON, FOR ANY LOSS, DAMAGES, COST OR EXPENSE WHICH MAY ARISE FROM ANY FAILURE OF PERFORMANCE BY VENDOR, OPRA, OPRA'S PROCESSOR OR ANY OPRA PARTICIPANT, OR FROM ANY DELAYS, INACCURACIES, ERRORS IN OR OMISSIONS OF, ANY OF THE OPRA DATA OR IN THE TRANSMISSION OR DELIVERY THEREOF, WHETHER OR NOT DUE TO ANY NEGLIGENT ACT OR OMISSION ON THE PART OF VENDOR, OPRA, OPRA'S PROCESSOR OR ANY OPRA PARTICIPANT. IN NO EVENT SHALL VENDOR, OPRA, OPRA'S PROCESSOR OR ANY

PARTICIPANT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, TRADING LOSSES, OR DAMAGES RESULTING FROM INCONVENIENCE OR LOSS OF USE OF THE SERVICE.

24. The terms of this agreement may be modified at any time upon notice. If I do not assent to this agreement as modified at or prior to the time I next attempt to access the Service, this agreement shall automatically be terminated. This agreement as modified shall apply to my use of the Service from and after the date of the modification.

25. My receipt of the OPRA Data hereunder may be terminated at any time by me or by Vendor upon 30 days' notice from the terminating party to the other party, and may be terminated immediately upon a determination by Vendor or OPRA that I am not in compliance with this agreement.

26. Nothing herein shall be deemed to prevent or restrict OPRA, OPRA's Processor or any OPRA Participant from discontinuing to furnish OPRA Data for dissemination or from making such changes in the speed of transmission, the characteristics of the electrical signals representing the OPRA Data or the manner of disseminating the same, as OPRA shall from time to time determine to be appropriate, with or without notice. I shall not hold OPRA, OPRA's Processor, or any OPRA Participant liable for any resulting liability, loss or damage that may arise therefrom.

27. I agree to notify Vendor promptly of any changes in the information provided herein and to furnish Vendor any additional information requested by it in connection with my receipt of the OPRA Data.

28. The parties acknowledge and agree that this agreement is for the express benefit of OPRA, OPRA's Processor and each OPRA Participant.

29. The provisions of paragraphs 22, 23, and 28 will survive any termination of this agreement and will remain in full force and effect.

30. All notices under this agreement may be provided electronically. All notices shall be provided where I access the OPRA Data electronically, and all termination notices to Vendor shall be deemed provided if I elect to deactivate the options feature of my account with Vendor.

31. The purpose of this paragraph is to determine whether I am a "Nonprofessional" for OPRA's purposes. OPRA defines a "Nonprofessional" as a legal person for whom the statements set out in paragraph 31 below are true. I represent and agree that the following statements are and will continue to be true for so long as I receive OPRA Data as a Nonprofessional:

a. I am a "natural person" (an individual human or feline being). You are not a corporation, partnership, limited liability company, or other form of entity.

b. I shall use the OPRA Data solely in connection with personal investment activities and the personal investment activities of immediate family members and qualifying trusts of which I am the trustee or custodian. In any case, I shall not use the OPRA Data in connection with any trade, business,

professional or other commercial activities. The term "immediate family members" means, with reference to a particular natural person, the spouse of that person, that person's lineal ancestors (that is, parents, grandparents, etc.) and lineal descendants (that is, children, grandchildren, etc.), and the spouses (including surviving spouses) of that person's lineal ancestors and lineal descendants. The term includes step and adoptive relationships.

c. I am not a "Professional." For a natural person who works in the United States, a "Professional" is a natural person who is: (i) registered or qualified with the Securities and Exchange Commission, the Commodities Futures Trading Commission, any state securities agency, any securities exchange/association, or any commodities/futures contract market/association, (ii) engaged as an "investment adviser," as that term is defined in the Investment Advisers Act of 1940 (whether or not registered or qualified under that Act); or (iii) employed by a bank or other organization exempt from registration under federal and/or state securities laws to perform functions that would require such person to be so registered or qualified if such person were to perform such functions for an organization not so exempt. For a natural person who works outside of the United States, a "Professional" is a natural person who performs the same functions as someone who would be considered a "Professional" in the United States.

32. I agree to notify Vendor promptly if my circumstances change such that any of the statements in paragraphs 31(a)-(c) above would no longer be true.

33. I hereby agrees to indemnify and hold you, your affiliates, and their respective officers, directors, employees and agents, and their respective successors and assigns, harmless from and against any and all losses (including but not limited to consequential damages), liabilities, tax consequences (including excise taxes, penalties and interest), demands, claims and expenses, attorneys' fees, damages (including consequential, incidental, special or exemplary) arising out of any actions or omissions by you, or your agents in connection herewith, which are not caused by gross negligence or willful misconduct. This provision shall survive the termination of this agreement and shall be binding upon, and inure to the benefit of, each party's respective successors, assigns, heirs, and personal representatives.

By selecting the "Accept" button below:

I. I agree that I have read and understand all of the terms and conditions set forth above;

II. I understand and acknowledge that this agreement contains a predispute arbitration clause in paragraph 15 above.

III. I attest that the representations in paragraph 31 are truthful; and

IV. I agree that I intend to form a legally binding and valid contract under which I will be bound by all of the terms and conditions set forth above, including in connection with any transactions in options which have been or may be purchased, sold, exercised or endorsed for my account. .