**KAPLAN FOX & KILSHEIMER LLP**
Matthew B. George (SBN 239322)
Maia C. Kats (*pro hac vice*)
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*mgeorge@kaplanfox.com*
*mkats@kaplanfox.com*
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**COTCHETT, PITRE & MCCARTHY, LLP**
Anne Marie Murphy (SBN 202540)
Mark C. Molumphy (SBN 168009)
Noorjahan Rahman (SBN 330572)
Tyson C. Redenbarger (SBN 294424)
Julia Q. Peng (SBN 318396)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
*amurphy@cpmlegal.com*
*mmolumphy@cpmlegal.com*
*nrahman@cpmlegal.com*
*tredenbarger@cpmlegal.com*
*jpeng@cpmlegal.com*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Robinhood Outage Litigation* | Case No. 3:20-cv-01626-JD |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiffs bring this putative class action against Defendants Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), demanding a trial by jury.  Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to each individual Plaintiff, which are based on personal knowledge.

2.      Robinhood is an online brokerage firm founded in 2013 that states it is "a pioneer in commission-free investing."  Robinhood's customers can place securities trades through the firm's website and by using a web-based application (or "app").  Robinhood permits customers, when its trading platform is operational, to purchase and sell certain securities, including option contracts, and engage in trading on margin.  The company has no storefront offices and operates entirely online.  Robinhood is a FINRA[1] regulated broker-dealer

3.      Unfortunately for Robinhood's customers, including Plaintiffs and the putative class (the "Class"), Robinhood's trading systems have repeatedly crashed—preventing Plaintiffs and the Class from accessing their accounts and making any trades through the firm's website or app.  The most significant crash occurred on Monday, March 2, 2020, and extended through mid-day Tuesday, March 3, 2020.  The March 2-3 outage crashed all of Robinhood's operating systems for more than a full trading day.

4.      Several days later, on March 9, 2020, Robinhood again experienced another complete system outage.  Plaintiffs and Class members again experienced significant outages on March 13, 16, and June 18, 2020.  In total, the Robinhood website and app have gone down 47 times since March.[2]  The service outages are individually referred to as an "Outage" and

---

[1]  Financial Industry Regulatory Authority, Inc. (FINRA) is a private corporation that acts as a a non-governmental, self-regulatory organization that regulates member brokerage firms and exchange markets.

[2]  Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug.19, 2020).

collectively as the "Outages".[3]

5.      During the Outages, Robinhood's customers were completely unable to use the services, including to buy or sell securities or to exercise option contracts through Robinhood's website and app.   Robinhood's help center, which should provide email and phone support, was also unavailable during the Outages and customers were unable to obtain any information or meaningful assistance from Robinhood.  During the Outages, Class members repeatedly attempted to contact the help center, by phone and email, to no avail.  Robinhood has admitted that during the Outages the help center was unavailable and that Robinhood's phone support was non-existent.  Customers were thus left with no recourse during the Outages, unable to access their funds or exercise time-sensitive trades.  They were forced to sit helplessly until services were re-established.

6.      The Outages on March 2 and 3, 2020, were particularly devastating for Plaintiffs and the Class as the Dow Jones Industrial Average rose 5.1% during that time.[4]  Meanwhile, Robinhood users were locked out of their accounts and unable to access their funds or make trades—while the markets gained a record $1.1 trillion.  The Outage on March 9, 2020, was similarly harmful, as the Dow Jones Industrial Average had its largest point plunge in history up to that date.[5]  Again, Plaintiffs and the Class were unable to access their funds or make trades and suffered significant losses as a result.  Trades that were placed before the Outages, for which Plaintiffs and the Class received trade confirmations, also failed, or were processed at incorrect times or incorrect prices during the Outages.  Additionally, Plaintiffs and the Class members were, at times during the Outages, able to seemingly place trades, and again the Plaintiffs and class received trade confirmations; however, it was later learned that those trades also failed, or were

---

[3] Plaintiffs and the Class seek damages related to the Outages on March 2, 3, and 9, 2020.

[4] Fred Imbert and Eustance Huang, *Dow roars back from coronavirus sell-off with biggest gain since 2009, surges 5.1%,* CNBC (March 2, 2020)  https://www.cnbc.com/2020/03/01/awaiting-us-stock-futures-open-at-6-pm-after-wall-streets-worst-week-since-2008.htm  (last visited Aug. 19, 2020).

[5] Kimberly Amadeo, *How Does the 2020 Stock Market Crash Compare With Others?* The Balance (April 27, 2020) https://www.thebalance.com/fundamentals-of-the-2020-market-crash-4799950#:~:text=The%20stock%20market%20crash%20of,point%20drops%20in%20U.S.%20history (last visited Aug. 19, 2020).

processed at incorrect times or incorrect prices during or after the Outages.

7.     Such failures constitute negligence, breaches of contract and fiduciary duties, and are violations of FINRA regulations. Per FINRA regulations, Robinhood has a duty to process trades timely and at the best prices for its users.  Robinhood is also required to have a business continuity plan identifying a procedure relating to an emergency or significant business disruption. During the Outages, Robinhood failed to process trades in a timely manner or at all, and it was discovered that Robinhood's continuity plan was nonexistent.  Robinhood simply abandoned its customers.

8.     The loss of access to Robinhood's trading platform and absence of contingency plans and customer service support caused concrete, particularized, and actual damages for Robinhood customers.  Plaintiffs and members of the class were unable to monitor their accounts, make trades, or exercise their option contracts to capitalize on gains or to mitigate losses.  Many Plaintiffs and Class members held options contracts that expired, worthless, during the Outages. And some of those contracts, such as the contracts held by certain Plaintiffs herein, were exercised by Robinhood during the Outages, without express authorization or approval of its customers, at a loss.  Other Plaintiffs and Class members were subjected to forced margin calls as a result of the Outages, which they otherwise would have been able to avoid if they had access to their accounts.

9.     Robinhood accepts fault for the Outages, which it attributes to stress on its systems. According to Robinhood employees, the March 2020 "outage was rooted in issues with the company's phone app and servers.  They said the start-up had underinvested in technology and moved too quickly rather than carefully."[6]  These flaws were known and insufficiently addressed: "[s]oftware mishaps have rocked Robinhood before," including in 2018, for example, when its "options trading service had an outage that locked consumers out of their accounts and stopped

---

[6] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020)
https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug. 19, 2020).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

them from closing positions[.]"[7]

10.     In offering trading services, Robinhood assumed a duty to ensure that its systems were sufficiently equipped to reliably deliver such services under reasonably foreseeable customer demands and market conditions, such as those at issue in this case.  Robinhood acted negligently by failing to adequately or properly equip itself technologically and systemically to maintain Plaintiff and Class members' access to trading services.  Due solely to its own negligence and failure to maintain adequate infrastructure, Robinhood breached obligations owed to Plaintiff and Class members and caused them substantial losses.   Its failures are all the more serious due to Robinhood's history of such failures, the magnitude of the Outages, the absence of alternative means for customers to protect their positions and investments, and lack of communication and customer support.

11.     Plaintiffs bring this class action on behalf of Robinhood customers who were denied access to their Robinhood trading accounts during the Outages and for the many, including themselves, who suffered losses as a result of the Outages.  Plaintiffs assert putative class action claims generally including negligence, breach of contract, breach of fiduciary duty, and violations of California's Unfair Competition Law, on behalf of themselves and all other Robinhood customers who are similarly situated.   Plaintiffs seek damages, restitution, disgorgement and declaratory relief.

## PARTIES

12.     Plaintiff Daniel Beckman ("Plaintiff Beckman") is a citizen of Florida and is over the age of 18.

13.     Plaintiff Joseph Gwaltney ("Plaintiff Gwaltney") is a citizen of Florida and is over the age of 18.

14.     Plaintiff Emma Jones ("Plaintiff Jones") is a citizen of Texas and is over the age

---

[7] John Gittlelsohn, Annie Massa, and Jennifer Surane, *Robinhood Maxed Out a Credit Line Last Month as Markets Fell*, Bloomberg (March 10, 2020) https://www.bloomberg.com/news/articles/2020-03-10/robinhood-maxed-out-credit-line-last-month-amid-market-tumult (last visited Aug. 19, 2020).

of 18.

15.     Plaintiff Leila Kuri ("Plaintiff Kuri") is a citizen of North Carolina and is over the age of 18.

16.     Plaintiff Jared Leith ("Plaintiff Leith") is a citizen of Minnesota and is over the age of 18.

17.     Plaintiff Omeed Mahrouyan ("Plaintiff Mahrouyan") is a citizen of California and is over the age of 18.

18.     Plaintiff Mahdi Heidari Moghadam ("Plaintiff Moghadam") is a citizen of Texas and is over the age of 18.

19.     Plaintiff Howard Morey ("Plaintiff Morey") is a citizen of Oklahoma and is over the age of 18.

20.     Plaintiff Colin Prendergast ("Plaintiff Prendergast") is a citizen of California and is over the age of 18.

21.     Plaintiff Raghu Rao ("Plaintiff Rao") is a citizen of New Jersey and is over the age of 18.

22.     Plaintiff Michael Riggs ("Plaintiff Riggs") is a citizen of Pennsylvania and is over the age of 18.

23.     Plaintiff Kevin Russell ("Plaintiff Russell") is a citizen of Illinois and is over the age of 18.

24.     Plaintiff Jason Steinberg ("Plaintiff Steinberg") is a citizen of California and is over the age of 18.

25.     Plaintiff Jared Ward ("Plaintiff Ward") is a citizen of California and is over the age of 18.

26.     Plaintiff Mengni Xia ("Plaintiff Xia") is a citizen of New York and is over the age of 18.

27.     Defendant Robinhood Financial is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  It is a wholly-owned subsidiary of Robinhood Markets.  Robinhood Financial is registered as a broker-dealer with the U.S. Securities

& Exchange Commission ("SEC").  Defendant Robinhood Financial acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities.

28.     Defendant Robinhood Securities is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.  It is a wholly-owned subsidiary of Defendant Robinhood Markets.

29.     Defendant Robinhood Markets is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  Defendant Robinhood Markets is the corporate parent of Defendants Robinhood Financial and Robinhood Securities.  Robinhood Markets is also the entity that actually owns, develops and/or maintains the technology infrascturcture that was at the root cause of and that was impacted by the Outages.  Robinhood Markets is the developer and provider of the mobile application that Plaintiffs downloaded and used as customers of Robinhood.  Robinhood Markets is the employer of most, if not all, of the key engineering personnel who developed, designed and maintained the technology infrastructure that failed during the Outages.  Most, if not all, of Robinhood Markets' engineering employees who were responsible for developing and/or maintaining Robinhood's electronic securities trading application perform their work at facilities and/or on equipment owned or leased by Robinhood Markets, which also acts as a technology vendor for its own subsidiaries Robinhood Financial and Robinhood Securities.  Robinhood Markets also pays for and provides staffing and services pertaining to customer service for Robinhood Financial and Robinhoood Securities, including at times pertinent to the Outages.  Certain personnel maintain multiple roles at the various entities, such as Robinhood Markets' current director of engineering who also serves as Robinhood Financial's Chief Technology Officer, creating intertwined management and supervision of the technology infrastructure that failed during the Outages and gives rise to Plaintiffs' claims.  Plaintiffs bring their claims against Robinhood Markets in its capacity as a parent corporation of the co-defendants, but also in its own capacity as an alleged tortfeasor on the claims identified below.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S.C §1332(d), because the amount in controversy for the Classes exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members defined below and minimal diversity exists because the majority of putative Class members are citizens of a state different than Defendants.

31.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District where Robinhood is headquartered and where it developed and sold the financial services which are the subject of the present complaint.  Finally, venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because Robinhood is headquartered in Menlo Park and a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

32.     This Court has personal jurisdiction over Robinhood because it is headquartered in and authorized to do business and does conduct business in California, and because it has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its business within this state to render the exercise of jurisdiction by this Court permissible.

## INTRADISTRICT ASSIGNMENT

33.     Pursuant to Civil Local Rule 3-2(c), an intradistrict assignment to the San Francisco Division is appropriate because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in this Division, and because the District Court transferred this matter to the San Francisco Division after it was originally filed in the San Jose Division, and then consolidated about a dozen related matters filed in, transferred to, or removed to this District.

## FACTUAL ALLEGATIONS

### Robinhood's Business Model

34.     Robinhood was founded by Vlad Tenev and Baiju Bhatt, who met each other at Stanford University in 2005.  After teaming up on several ventures, including a high-speed trading firm, they created Robinhood in 2013.[8]

---

[8] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug.19, 2020).

35.     Robinhood offers people the ability to invest in stocks, ETFs, and options through an electronic trading platform, both online and through an app.

36.     Robinhood competes with other online and traditional brokerages by not charging trading fees.  At the time of its founding, most brokerage firms charged about $10 or more to make a trade.  Robinhood also competes with traditional financial institutions by offering more user-friendly digital services, which has made Robinhood very popular, especially with younger traders. In July of 2020, Robinhood said it had over 13 million users on its platform.  In August 2020, after raising $200 million in Series G funding, Robinhood was valued at $11.2 billion.[9]

37.     Robinhood's original product was commission-free trades of stocks and exchange-traded funds.  As Robinhood grew, it added more risky and complex products—like options and margin trading.  Those products, combined with Robinhood's game-like interface, have been a hit with millenials, and its typical customer is 31 years old on average.[10]

38.     Robinhood's trading app, when functional, is designed to be easy to use. For example, on the Robinhood home screen, there is a list of popular stocks that users can "trade" with just the touch of the screen, which skips many of the steps that other firms require.

---

[9] Kate Rooney, *Robinhood snags third mega-investment of the year, boosting valuation to $11.2 billion,* CNBC (August 17, 2020) https://www.cnbc.com/2020/08/17/robinhood-announces-another-mega-round-valuation-soars-to-11point2b.html (last visited Aug. 19, 2020).
[10] Graham Rapier, *Robinhood had to install protective glass after frustrated traders kept showing up at its office*, Business Insider (July 10, 2020) https://www.businessinsider.com/robinhood-office-installed-bulletproof-glass-after-frustrated-traders-visited-report-2020-7 (last visited Aug. 19, 2020).

39.     Robinhood also includes many features that make investing appear more like a game.  New members are given a free share of stock when they join Robinhood—to reveal the stock users scratch-off images that look like a lottery ticket.[11]  Once the stock is revealed, confetti appears to fall from the top of the screen.




40.     One of Robinhood's popular features is the ability for users to engage in options trading.  Robinhood describes its options trading as "quick, straightforward & free."  To start trading options, users respond to multiple-choice questions.  "Beginners are legally barred from trading options, but those who click that they have no investing experience are coached by the app on how to change the answer to '*not much*' experience.  Then people can immediately begin option trading."[12]

41.     According to the New York Times, Robinhood's "success appears to have been built on a Silicon Valley playbook of behavioral nudges and push notifications,[13] which has drawn inexperienced investors into the riskiest trading. . . And the more that customers engaged in such

---

[11] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug.19, 2020).
[12] *Id.*
[13] Nudges and push notifications are reminders or prompts sent directly to users. Nudges and push notifications may appear on a users home screen similar to a text message or email alerts.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

behavior, the better it was for the company."[14]  "At the core of Robinhood's business is an incentive to encourage more trading.  It does not charge fees for trading, but it is still paid more if its customers trade more."[15]

42.     A research analyst at Chicago-based Sumner Capital group pointed out that Robinhood's app has "slick interfaces.  Confetti popping everywhere…They try to gamify trading and couch it as an investment."[16]  Unfortunately for many Americans, losing investment and retirement funds or accruing colossal debt is not a game, and the consequences have been tragic.[17]

43.     Robinhood's digital platform app has been beset by its technology glitches, which have been significant and ongoing.  "In 2018, Robinhood released software that accidentally reversed the direction of options trades giving customers the opposite outcome from what they expected.  Last year, it mistakenly allowed people to borrow infinite money to multiply their bets, leading to some enormous gains and losses."[18]

44.     Robinhood claims that its more recent Outages resulted from "stress on [their] infrastructure" due to "unprecedented load," and "record volume." [19]  But these circumstances, even if true, were encouraged and driven by Robinhood's own business model—encourage its users to trade as much as possible.[20]

---

[14] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug.19, 2020)..
[15] *Id.*
[16] Antoine Gara, Sergei Klebnikov, *20-Year-Old Robinhood Customer Dies by Suicide After Seeing a $730,000 Negative Balance*, Forbes (June 17, 2020) https://www.forbes.com/sites/sergeiklebnikov/2020/06/17/20-year-old-robinhood-customer-dies-by-suicide-after-seeing-a-730000-negative-balance/#11d468081638 (last visited Aug. 19, 2020).
[17] *Id.*
[18] *Robinhood options errors*, Elite Trader, https://www.elitetrader.com/et/threads/robinhood-options-errors.327998/ (last visited Aug. 19, 2020).
[19] Baiju Bhatt and Vladimir Tenev, *An Update from Robinhood's Founders*, Robinhood (March 3, 2020) https://blog.robinhood.com/news/2020/3/3/an-update-from-robinhoods-founders ((last visited Aug. 19, 2020).
[20] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug. 19, 2020).

45.     Robinhood's users trade more often than average, faster, and with more risk than traders who use other platforms.  According to an analysis of new filings from nine brokerage firms by the research firm Alphacution for The New York Times, in the first quarter of 2020, Robinhood users traded nine times as many shares as E-Trade customers and 40 times as many shares as Charles Schwab customers. They also bought and sold 88 times as many risky options contracts as Schwab customers, relative to the average account size, according to the analysis. [21]



**Velocity of Options Trading at Leading Retail Brokers**
Options contracts traded for every dollar in the average customer's account.

| | |
|---|---|
| Robinhood | 25,840 |
| TD Ameritrade | 2,188 |
| E-Trade | 1,844 |
| Charles Schwab | 292 |

Note:  Figure is the number of options contracts traded in the first quarter of 2020, per dollar in the average customer account. Robinhood does not provide data on customer holdings, but Alphacution estimated that the average account holds $4,800, based on customer cash holdings listed in financial filings.

By The New York Times | Source: Alphacution Research Conservatory based on company filings

46.     According to Tim Welsh, founder and CEO of wealth management consulting firm Nexus Strategy, "they should put a cigarette warning label on Robinhood, because it could be hazardous to your financial health the more you trade. Every study on planet Earth has shown day traders that are not sophisticated do not make money. They game-ify it, they throw confetti after each trade, the make it 'free' but ultimately it's a losers game."[22]

**Robinhood's Services and How it Makes Money**

47.     When a user opens an account with Robinhood, they enter into a Customer Agreement with "Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and assigns."  Prior to the Outages in March 2020, the Customer Agreement had most recently been revised on February 5, 2020.  After the March Outages, Robinhood revised its Customer Agreement

---

[21] *Id.*
[22] *Id.*

on April 28, 2020, and again on June 22, 2020.

48.     Robinhood provides its users educational information with the tagline "Investing can be complicated — that's why we're here. From beginners' guides to timely features, explore articles that make finance a little more understandable."  The information provided varies from investment strategy for investors in their 20's, to basic information about the market and common terms used in investing.[23]  Robinhood's interface also highlights particular stocks and "makes suggestions to users on what to trade next."[24]

49.     Robinhood offers a paid subscription product called "Gold."  Users who purchase Gold memberships pay $5 a month to have faster deposit processing, access to professional research, the ability to see additional information about stock prices, and the ability to invest on margin.[25]

50.     Robinhood also makes money from "payment for order flow" fees.  In fact, payment for order flow fees are reportedly Robinhood's primary revenue stream—greatly exceeding what it earns from Robinhood Gold, or from the interest it makes on cash balances in customer accounts, which is another source of Robinhood's revenue.

51.     Payment for order flow fees are paid to Robinhood from electronic market makers for passing on customer orders.  For example, if a Robinhood users purchase a share of Apple on through their account, Robinhood sends that order to a large market maker like Citadel Securities and receives a few pennies in return—i.e., the "payment for order flow" fees.  Citadel, meanwhile, completes the trade and makes a few pennies itself.[26]

52.     For Robinhood, those fees add up. According to a recent SEC filing, Citadel

---

[23] *See* https://learn.robinhood.com/ (last visited Aug. 19, 2020).

[24] Alicia Adamcyk, Trading Apps Like Robinhood Are Having A Moment. But Users Should Be Careful, CNBC (Aug. 21, 2020), https://www.cnbc.com/2020/08/21/robinhood-is-having-a-moment-users-should-be-careful.html (last visited Aug. 21, 2020).

[25] A margin account is a brokerage account in which the broker lends the investor money to buy more securities than what they could otherwise buy with the balance in their account.

[26] Jeff John Roberts, David Z. Morris, *Robinhood makes millions selling your stock trades … is that so wrong?,* Fortune (July 8, 2020), https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (last visited Aug. 19, 2020).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Securities and several other firms paid Robinhood nearly $100 million in the first quarter of 2020.[27] And in the second quarter of 2020 — Robinhood made $180 million off trades, roughly double from the prior quarter.[28]

**The Outages**

53.     At 9:33 am[29] the morning of March 2, 2020, a Monday and the first day of the month for trading traditional securities, Robinhood's trading platform completely stopped functioning.  As a result, at that moment, the platform stopped processing orders entered by customers prior to the Outage and customers were unable to enter new orders. The majority of users were also prevented from accessing their account and funds altogether.   Robinhood was unable to restore full functionality until Tuesday, March 3, 2020 at 11:54 am.  In total, Robinhood's systems were nonfunctional or inaccessible to customers for 26 hours and 21 minutes.

54.     At 11:02 am the morning of March 2, Robinhood publicly acknowledged the



"downtime" and impact on "all functionalities" of the platform on Twitter: [30]

The Robinhood Help account (@AskRobinhood) is owned or controlled by Robinhood.

---

[27]  *Id*.

[28]  Kate Rooney, Maggie Fitzgerald, *Here's how Robinhood is raking in record cash on customer trades — despite making it free*, CNBC (August 13, 2020),  https://www.cnbc.com/2020/08/13/how-robinhood-makes-money-on-customer-trades-despite-making-it-free.html?__source=iosappshare%7Ccom.apple.UIKit.activity.Mail (last visited Aug. 19, 2020).

[29] All times are Eastern Standard Time, unless otherwise indicated.

[30] Twitter, https://twitter.com/AskRobinhood/status/1234509495084240898  (last visited Aug. 19, 2020).

55.     Around 4:00 pm on the afternoon of March 2, Robinhood emailed its customers directly to repeat the substance of the message posted to Twitter earlier that morning, which was that Robinhood was "experiencing downtime across [its] platform," that the outage was "affecting functionality on Robinhood," and that the outage was affecting customers' "ability to trade":

**Update on Robinhood System Status**

This morning, starting at 9:33 AM ET, we started experiencing downtime across our platform. These issues are affecting functionality on Robinhood, including your ability to trade.

All of us at Robinhood are working as hard as we can to resume service, and we'll update you as soon as the issue is resolved. We understand the impact this is having and we apologize for any trouble this has caused.

Please check our status page at status.robinhood.com. Thank you for being a Robinhood customer.

Sincerely,
The Robinhood Team
robinhood.com

56.     At 4:07 pm on March 2, immediately after emailing its customers, Robinhood



posted another message to Twitter publicly confirming that its platform was "still experiencing system-wide issues" and that it had yet to "resume service":[31]

57.     Early on March 3, 2020, at 2:19 am, Robinhood posted two messages to its Twitter account reporting that its systems were "currently back up and running," that customers might

---

[31] Twitter, https://twitter.com/AskRobinhood/status/1234586094395523074 (last visited Aug. 19, 2020).

still "observe some downtime" as Robinhood prepared for the day, and acknowledging that "issues like this are not acceptable":[32]



58.    At about 2:45 am the morning of March 3, Robinhood sent another email to customers saying directly to them what it had just said publicly, which was that its systems were "currently back up and running," that the outage was "not acceptable," and that Robinhood realized that it had "let [customers] down":

Robinhood is currently back online

We're reaching out to let you know that Robinhood is currently back up and running. We want to assure you that your funds are safe and personal information was not affected.

When it comes to your money, issues like this are not acceptable.   We realize we let you down, and our team is committed to improving  your experience.

59.    At 10:11 am on March 3, Robinhood reported, again through its public-facing

[32]Twitter, https://twitter.com/AskRobinhood/status/1234740273877405697  (last visited Aug. 19, 2020).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Twitter account, that its "systems are currently experiencing downtime" and that "full functionality" of the Robinhood platform remained unavailable to customers: [33]

60.     At 11:35 am, later the morning of March 3, Robinhood stated on its Twitter account that its service had "been partially restored" and that it was "working toward restoring and maintaining full functionality."[34]

61.     At 11:54 am on March 3, Robinhood reported that its systems had been "now



fully restored", while noting that its users deserved better: [35]

62.     Also on March 3, a Robinhood spokesperson admitted that the cause of the Outage was "instability in a part of our infrastructure that allows our systems to communicate with each other."  At some point later that day, Robinhood's systems were restored.

63.     Later, in a blog post on Robinhood's website dated March 3, 2020, Robinhood's founders stated:

> Our team has spent the last two days evaluating and addressing this issue. We worked as quickly as possible to restore service, but it took us a while. Too long. We now understand the cause of the outage was stress on our infrastructure—which struggled with unprecedented load. That in turn led to a "thundering herd" effect—triggering a failure of our DNS system.
>
> Multiple factors contributed to the unprecedented load that ultimately led to the outages. The factors included, among others,

---

[33] Twitter, https://twitter.com/AskRobinhood/status/1234859068763844613 (last visited Aug. 19, 2020).

[34] Twitter, https://twitter.com/AskRobinhood/status/1234880124463435776 (last visited Aug. 19, 2020).

[35] Twitter, https://twitter.com/AskRobinhood/status/1234884989189124096 (last visited Aug. 19, 2020).

Case No. 3:20-cv-01626-JD
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

> highly volatile and historic market conditions; record volume; and record account sign-ups.

2

3

> Our team is continuing to work to improve the resilience of our infrastructure to meet the heightened load we have been experiencing. We're simultaneously working to reduce the interdependencies in our overall infrastructure. We're also investing in additional redundancies in our infrastructure. **[36]**

4

5

6       64.     Notwithstanding Robinhood's explanations and apologies, its trading platform

7   crashed again the very next week.  On March 9, 2020, Robinhood once again experienced outages

8   with customers unable to access their accounts and transact on the public markets.[37]  Services were

9   completely unavailable at the start of the trading day and not fully restored until more than five

10  hours later.[38]

11      65.     As Robinhood admits, the Outages were a result of internal failures, not a result of

12  the overall market trading volume.  On March 2, 2020, market data shows that on all U.S. exchanges

13  combined the volume of shares traded was 14,163,098,470 shares. On March 3, 2020, the volume

14  was 14,900,627,470 shares, and on March 9, 2020, the volume was 17,614,290,337 shares.[39]  While

15  these numbers are higher than average, they are not unheard of and are not records.  Trading volume

16  on February 27 and February 28, 2020, just before the outage, far exceeded either March 2 or 3,

17  2020 with 15,821,612,374 and 19,357,141,449 shares trading hands each day, respectively.

18

19

20

21

22  [36] *See* https://blog.robinhood.com/ (last visited Aug. 19, 2020).

23  [37] Jonathan Shieber, *The Robinhood app went down again as stocks got routed on Wall St.*, TechCrunch (Mar. 9, 2020), https://techcrunch.com/2020/03/09/the-robinhood-app-is-downagain-as-stocks-get-routed-on-wall-st/ (last visited Aug. 19, 2020).

24  [38]Jay Peters, *Robinhood experienced its third outage in a week as US stocks have*

25  *plummeted*, The Verge (March 9, 2020) https://www.theverge.com/2020/3/9/21171584/robinhood-outage-week-us-stocks-third-market

26  (last visited Aug. 19, 2020).

27  [39] *See* U.S. Equities Market Volume Summary, available at https://markets.cboe.com/us/equities/market_share/market/2020-03-02/, https://markets.cboe.com/us/equities/market_share/market/2020-03-03/,

28  https://markets.cboe.com/us/equities/market_share/market/2020-03-09/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

February 28 was the second busiest day in history based on trading volume.[40],[41]

66.     Furthermore, twelve years ago, in 2008 during the market volatility surrounding the financial crisis, there were two days on which trading volume was higher than the volume on any of the dates Robinhood crashed.  This includes the record for the highest trading volume on October 10, 2008, at 19.76 billion shares.[42]  Trading volume of this magnitude was readily foreseeable and Robinhood should have designed its system to handle it.

67.     During the Outages, users were unable to contact Robinhood because Robinhood's customer support "Help Center" was down and completely useless.  Customers were unable to contact any Robinhood representative through email, and there was no active phone number for customers to call.  Robinhood users were powerless—wholly unable to access their accounts or make trades to mitigate their damages.

68.     In Robinhood Securities, LLC's 2020 Annual Audited Report, filed with the SEC on April 13, 2020, Robinhood described the Outages:

> On March 2-3, 2020, the Robinhood platform experienced an outage across various services, which prevented customers from using the app, website, and help center and on March 9, 2020, the Robinhood platform experienced an outage across its trading products, which prevented customers from placing trades (collectively, the "Outages"). The Company is currently in the process of investigating and evaluating the impact of the Outages. There are many uncertainties associated with these types of incidents and possible impacts associated with service outages may include remediation costs to customers, systems upgrades, increased insurance costs, adverse effects on compliance with laws and regulations, litigation, and reputational damage.

69.     As of July 2020, Robinhood's website had experienced 47 service outages since March, including the nearly two-day outages on March 2 and 3, 2020.

70.     The significant and repeated Outages immediately increased public scrutiny of

---

[40] *See* U.S. Equities Market Volume Summary, available at https://markets.cboe.com/us/equities/market_share/market/2020-02-27/, https://markets.cboe.com/us/equities/market_share/market/2020-02-28/.

[41] Philip Stafford, Richard Henderson, *Intense' trading sends exchange volumes to record*, Financial Times (https://www.ft.com/content/de34a00a-5ca4-11ea-8033-fa40a0d65a98 (last visited Aug. 19, 2020).

[42] *Id.*

- 18 -

Robinhood.  On July 8, 2020, the New York Times published an article profiling Robinhood.[43]

71.     According to Robinhood employees quoted in the New York Times article, the March 2-3 "outage was rooted in issues with the company's phone app and servers.  The employees also said the start-up had underinvested in technology and moved too quickly rather than carefully."  The same employees, who declined to be identified in the article, bluntly stated that "the company failed to provide adequate guardrails and technology to support its customers." [44]

72.     On March 23, 2020, Robinhood offered a credit to many of its users and apologized for its recent multiple-day outages.  Robinhood called the offer a "goodwill" credit.  However, in exchange for the voucher, and even though multiple class actions had been filed by investors damaged by the Outages, the company required users to sign a document agreeing not to take legal action.[45]



73.     In the March 23, 2020, email to users Robinhood apologized, saying:

[43] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Aug. 19, 2020).
[44] *Id.*
[45] Kate Rooney, *Robinhood's offer to traders impacted by outage comes with a catch: No lawsuits allowed,* CNBC (March 27, 2020) https://www.cnbc.com/2020/03/27/robinhoods-offer-to-traders-impacted-by-outage-come-with-a-catch.html (last visited Aug. 19, 2020).

"We'd like to start with the apology you deserve: We're sorry for the recent outage on our platform. Your support is what helps us democratize finance for all, and we know we owe it to you to do better," the company said in an email to some users. "An apology alone won't rebuild your trust in us. Instead, we hope our actions will."

74.     The apologies have not been enough for users and many frustrated traders have shown up at Robinhood's Silicon Valley headquarters.  So many angry users have paid a visit to the office that the stock-trading app reportedly installed protective "bulletproof" glass.[46]

### **Regulatory Framework**

75.     As a broker-dealer, Robinhood is subject to various rules and regulations that impact many aspects of its business.  One requirement is that Robinhood must make, keep, furnish and disseminate records and reports prescribed by the Securities and Exchange Commission ("SEC").  FINRA also has specific recordkeeping rules for companies such as Robinhood.  The records Robinhood is required to keep, include but are not limited to, communications relating to their "business as such," customer account ledgers, securities records, order tickets, and trade confirmations.[47]

76.     Additionally, under federal and state securities laws, securities industry rules, and industry best practices, brokerage firms that offer online trading services to their customers are required to, among other things, ensure that customers receive the best execution of trades and that the firm has adequate operational capability to handle customer trading volume.  As far back as September 9, 1998, the U.S. Securities and Exchange Commission ("SEC") issued Staff Legal Bulletin No. 8, after widespread brokerage firm outages and trading delays that had occurred in October 1997.  Among other admonishments, the SEC warned firms that:

> Because broker-dealers are becoming increasingly reliant on technology to perform trading functions and to route customer orders to markets, these problems could be more severe during future periods of high trading volume.  Broker-dealers therefore need to take steps to prevent their operational systems from being overwhelmed by periodic spikes in systems message traffic due to high volume.  In particular, broker-

---

[46] Graham Rapier, *Robinhood had to install protective glass after frustrated traders kept showing up at its office*, Business Insider (July 10, 2020)  https://www.businessinsider.com/robinhood-office-installed-bulletproof-glass-after-frustrated-traders-visited-report-2020-7 (last visited Aug. 19, 2020).

[47] *See* https://www.finra.org/rules-guidance/key-topics/books-records (last visited Aug. 19, 2020).

1
2

dealers should not merely have sufficient systems capacity to handle average-to-heavy loads.  Rather, broker-dealers should have the systems capacity to handle exceptional loads of several times the average trading volume.[48]

3

77.     Brokerage firms were also reminded of these requirements by the National

4

Association of Securities Dealers ("NASD"), a self-regulatory organization that supervised broker-

5

dealers like Robinhood, in a 1999 Notice to Members ("NTM") 99-11, which stated that:  "First

6

and foremost, NASD Regulation reminds member firms of their obligations under [SEC] Staff

7

Legal Bulletin No. 8 to ensure that they have adequate systems capacity to handle high volume or

8

high volatility trading days."[49]

9

78.     Currently, FINRA, which superseded the NASD, and now governs brokers like

10

Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning."  Rule 5310.01

11

requires that Robinhood "must make every effort to execute a marketable customer order that it

12

receives promptly and fully."  By failing to respond at all to customers' placing timely trades, and

13

in fact, preventing them from doing so altogether, Robinhood has breached these obligations and

14

caused its customers substantial losses due solely to its own negligence and failure to maintain

15

adequate infrastructure.

16

79.     In addition to best execution, Robinhood has a duty to develop, design, test, and

17

monitor its services; and to create and maintain a written business continuity plan identifying

18

procedure relating to an emergency or significant business disruption.  Such procedures must be

19

reasonably designed to enable the company to meet its existing obligations to customers during an

20

emergency, such as an outage.  Indeed, FINRA Rule 4370 requires such a business continuity plan

21

to, at minimum, address "mission critical systems."  These systems are defined as "any system that

22

is necessary, depending on the nature of a member's business, to ensure prompt and accurate

23

processing of securities transactions, including, but not limited to, order taking, order entry,

24

execution, comparison, allocation, clearance and settlement of securities transactions, the

25

maintenance of customer accounts, access to customer accounts and the delivery of funds and

26

securities."  FINRA Rule 4370(g)(1).

27

---

[48] Available at: https://www.sec.gov/interps/legal/slbmr8.htm (last visited Aug. 19, 2020).

28

[49] Available at: https://www.finra.org/rules-guidance/notices/99-11 (last visited Aug. 19, 2020).

80.     Robinhood's written business continuity plan that was in place at the time of the March Outages, attached as **Exhibit A** was a one-page document with a section entitled "contact us" where Robinhood provided the following:

> If after a significant business disruption you cannot contact us as you usually do through our website robinhood.com or through our mobile applications, you should call our emergency number in Menlo Park, CA at (844) 428-5411 or submit a ticket at support.robinhood.com.

However, during the Outages and since, there was no way to get in touch with a live person, and the phone number provided was useless.  Nevertheless, during the Outages, many Plaintiffs and Class members attempted to seek support by calling the number provided by Robinhood, with no success whatsoever.  Plaintiffs also attempted to contact support.robinhood.com, again to no avail. Emails were not responded to at all, or not for several days until long after the Outages had done their damage.  Additionally, during the Outages, attempts to contact Robinhood through its website at robinhood.com were also futile as the website was completely down for the duration of the Outages.  Following the Outages, employees at Robinhood confirmed that the Company did not offer any phone support.

81.     Since the Outages, Robinhood has modified its business continuity plan—notably, the phone number has now been removed and there are no references to phone support.[50] Robinhood also deleted the following assurance:

> Our business continuity plan addresses: data back-up and recovery; all mission critical systems; financial and operational assessments; alternative communications with customers, employees, and regulators; alternate physical location of employees; critical supplier, contractor, bank and counter-party impact; regulatory reporting; and assuring our customers prompt access to their funds and securities if we are unable to continue our business. As an on-line broker-dealer, it also addresses the recovery of technology systems. In general, our technology systems are cloud-hosted and at separate locations. This design ensures that if one of our locations suffers a disruption in service, systems at an alternate location can be used to continue to provide service.

82.     Robinhood's failure to have a proper business continuity plan, or any backup plan

---

[50] *See* current version of Robinhood Financial and Robinhood Securities Business Continuity Plan Summary, available at https://cdn.robinhood.com/assets/robinhood/legal/RHS%20RHF%20Business%20Continuity%20Plan.pdf  (last visited Aug. 19, 2020).

whatsoever, was solely attributable to its own negligence.  Additionally, by failing to timely execute trades during the Outages, Robinhood violated FINRA Rule 2232 by failing to maintain accurate records of accounts and trade confirmations (including attempted trades), and Rule 3120, by failing to have a sufficient supervisory system to gain compliance with regulatory laws.

83.     Robinhood has a history of breaching its legal obligations.  Just a few months before the outage, on December 19, 2019, FINRA announced it fined Defendant Robinhood Financial $1.25 million for best execution violations related to its customers' equity orders and related supervisory failures that spanned from October 2016 to November 2017.[51]  As part of the findings, FINRA found that despite requirements to do so, Robinhood "did not have written procedures related to or addressing how it performed its 'regular and rigorous' reviews or reviewed non-marketable orders for best execution purposes."  As part of the settlement, Robinhood agreed to retain an independent consultant to conduct a comprehensive review of the firm's systems and procedures related to best execution.[52]

84.     Additionally, Robinhood has a history of failing to provide adequate service to its customers, particularly those engaged in options trading.  For example, a similar service outage occurred on April 14, 2016, where users were unable to trade securities for an extended period and their portfolios failed to accurately reflect their holdings.[53]  And in December 2018, customers trading in options faced comparable outages and incurred significant trading losses, similar to those affected during the Class Period.[54]  Again, in October of 2019, Robinhood suffered multiple days of systemwide failures and outages.[55]

85.     Despite those prior problems, Robinhood failed to remedy the flaws in its systems.

---

[51] *See* https://www.finra.org/media-center/newsreleases/2019/finra-fines-robinhood-financial-llc-125-million-best-execution (last visited Aug. 19, 2020).

[52] *Id*. at 6.

[53] Lucinda Shen, *A Glitch on This Stock Trading App Made Users Think They'd Lost Thousands of Dollars*, Yahoo Finance (April 14, 2020) https://in.finance.yahoo.com/news/glitch-stock-trading-app-made-192505186.html (last visited Aug.19, 2020).

[54] Dan DeFrancesco, *Robinhood's options trading stopped working, and customers are furious over the money they say they lost*, Business Insider (Dec. 13, 2018), https://www.businessinsider.com/robinhoods-options-trading-shutdown-and-customers-are-furious-2018-12 (last visited Aug. 19, 2020).

[55] *See* https://status.robinhood.com/history?page=4. (last visited Aug. 19, 2020).

## PLAINTIFFS' EXPERIENCES

### Plaintiff Beckman

86.     Plaintiff Beckman is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

87.     Plaintiff Beckman subscribed to Robinhood's Gold.

88.     On March 2, 2020, Plaintiff Beckman attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

89.     Plaintiff Beckman attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

90.     As a result of the Outages, Plaintiff Beckman estimates his losses are in excess of $10,000.

### Plaintiff Gwaltney

91.     Plaintiff Gwaltney is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

92.     Plaintiff Gwaltney subscribes to Robinhood's Gold.

93.     On March 2, 2020, Plaintiff Gwaltney attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

94.     On March 3, 2020, Plaintiff Gwaltney attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

95.     On March 9, 2020, Plaintiff Gwaltney attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

96.     Plaintiff Gwaltney attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

97.     As a result of the Outages, Plaintiff Gwaltney estimates his losses are in excess of $10,000.

### Plaintiff Jones

98.     Plaintiff Jones is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

99.   Plaintiff Jones subscribes to Robinhood's Gold.

100.   On March 2, 2020, Plaintiff Jones attempted to make trades, however, she was prevented from making those trades as a result of the Outage.

101.   Plaintiff Jones attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

102.   As a result of the Outages, Plaintiff Jones estimates her losses are in excess of $1,500.

**Plaintiff Kuri**

103.   Plaintiff Kuri is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

104.   On March 2, 2020, Plaintiff Kuri attempted to exercise options and make trades, however, she was prevented from making those trades as a result of the Outage.

105.   On March 3, 2020, Plaintiff Kuri attempted to exercise options and make trades, however, she was prevented from making those trades as a result of the Outage.

106.   Plaintiff Kuri attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

107.   As a result of the Outages, Plaintiff Kuri estimates her losses are in excess of $3,000.

**Plaintiff Leith**

108.   Plaintiff Leith is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

109.   Plaintiff Leith subscribes to Robinhood's Gold.

110.   On March 2, 2020, Plaintiff Leith attempted to exercise options, however, he was prevented from making those trades as a result of the Outage.

111.   On March 3, 2020, Plaintiff Leith attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

112.   On March 9, 2020, Plaintiff Leith attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

113.   Plaintiff Leith attempted to contact Robinhood customer support but only received

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

unhelpful boilerplate responses or no response at all.

114.     As a result of the Outages, Plaintiff Leith estimates his losses are in excess of $7,500.

**Plaintiff Mahrouyan**

115.     Plaintiff Mahrouyan is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

116.     Plaintiff Mahrouyan subscribes to Robinhood's Gold.

117.     On March 2, 2020, Plaintiff Mahrouyan attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

118.     On March 3, 2020, Plaintiff Mahrouyan attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

119.     On March 9, 2020, Plaintiff Mahrouyan attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

120.     Plaintiff Mahrouyan attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

121.     As a result of the Outages, Plaintiff Mahrouyan estimates his losses are in excess of $50,000.

**Plaintiff Moghadam**

122.     Plaintiff Moghadamis a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

123.     Plaintiff Moghadam subscribes to Robinhood's Gold.

124.     On March 2, 2020, Plaintiff Moghadam attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

125.     On March 9, 2020, Plaintiff Moghadam attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

126.     As a result of the Outages, Plaintiff Moghadam estimates his losses are in excess of $20,000.

127.     Moreover, as a result of the losses due to the Outages, Plaintiff Moghadam account value fell far below $25,000, which is the minimum amount required for day trading.  As a result,

Plaintiff Moghadam had to borrow from and pay interest to a lender to reach the minimum for day trading, which resulted in further losses.

**Plaintiff Morey**

128.    Plaintiff Morey is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

129.    Plaintiff Morey subscribes to Robinhood's Gold.

130.    On March 2, 2020, Plaintiff Morey attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

131.    On March 3, 2020, Plaintiff Morey attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

132.    On March 9, 2020, Plaintiff Morey attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

133.    Plaintiff Morey attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

134.    As a result of the Outages, Plaintiff Morey estimates his losses are in excess of $10,000.

**Plaintiff Prendergast**

135.    Plaintiff Prendergast is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

136.    On March 2, 2020, Plaintiff Prendergast attempted to exercise options, however, he was prevented from making those trades as a result of the Outage.

137.    Plaintiff Prendergast attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

138.    As a result of the Outages, Plaintiff Prendergast estimates his losses are in excess of $30,000.

**Plaintiff Rao**

139.    Plaintiff Rao is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

140.    Plaintiff Rao subscribes to Robinhood's Gold.

141.    On March 2, 2020, Plaintiff Rao attempted to place trades, however, he was prevented from making those trades as a result of the Outage.

142.    Plaintiff Rao attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

143.    As a result of the Outages, Plaintiff Rao estimates his losses are in excess of $49,000.

144.    As a consequence of Plaintiff Rao's losses due to the Outage, Robinhood forcibly liquidated some of Plaintiff Rao's positions due to a margin call.  Plaintiff Rao suffered significant losses as a result.

**Plaintiff Riggs**

145.    Plaintiff Riggs is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

146.    On March 2, 2020, Plaintiff Riggs attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

147.    Plaintiff Riggs attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

148.    As a result of the Outages, Plaintiff Riggs estimates his losses are in excess of $10,000.

**Plaintiff Russell**

149.    Plaintiff Russell is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

150.    On March 2, 2020, Plaintiff Russell attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

151.    On March 3, 2020, Plaintiff Russell attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

152.    As a result of the Outages, Plaintiff Russell estimates his losses are in excess of $1,000.

**Plaintiff Steinberg**

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

153.    Plaintiff Steinberg is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

154.    Plaintiff Steinberg subscribes to Robinhood's Gold.

155.    On March 2, 2020, Plaintiff Steinberg attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

156.    On March 3, 2020, Plaintiff Steinberg attempted to trade options, however, he was prevented from making those trades as a result of the Outage.

157.    Plaintiff Steinberg attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

158.    As a result of the Outages, Plaintiff Steinberg estimates his losses are in excess of $1,000.

### Plaintiff Ward

159.    Plaintiff Ward is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

160.    On March 2, 2020, Plaintiff Ward attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

161.    On March 3, 2020, Plaintiff Ward attempted to make trades, however, he was prevented from making those trades as a result of the Outage.

162.    Plaintiff Ward attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

163.    As a result of the Outages, Plaintiff Ward estimates his losses are in excess of $15,000.

### Plaintiff Xia

164.    Plaintiff Xia is a customer of Robinhood and entered into a Customer Agreement, as discussed further below, in order to use Robinhood's online trading systems.

165.    On March 2, 2020, Plaintiff Xia attempted to make trades, however, she was prevented from making those trades as a result of the Outage.

166.    On March 3, 2020, Plaintiff Xia attempted to make trades, however, she was

prevented from making those trades as a result of the Outage.

167.     Plaintiff Xia attempted to contact Robinhood customer support but only received unhelpful boilerplate responses or no response at all.

168.     As a result of the Outages, Plaintiff Xia estimates her losses are in excess of $15,000.

**CLASS ACTION ALLEGATIONS**

169.     Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class, as defined below:

> All Robinhood customers within the United States.[56]

170.     Additionally, or in the alternative, Plaintiffs may also bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclasses, as defined below:

> **Gold Subclass**:     All Robinhood customers within the United States who were subscribers to Robinhood's Gold membership service during the Outages.

> **Options Subclass**:     All Robinhood customers within the United States who owned a position in an option contract during the Outages.

> **Margin Subclass**:     All Robinhood customers within the United States who had margin accounts during the Outages.

171.     Excluded from the Class[57] are the Robinhood entities and their current employees, counsel for either party as well as their immediate families, as well as the Court and its personnel presiding over this action.

172.     This action has been brought and may properly be maintained as a class action against Robinhood pursuant to the provisions of Federal Rule of Civil Procedure 23.

173.     **Numerosity**: The precise number of members of the proposed Class is unknown to Plaintiffs at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly

---

[56] The "Class Period" for each claim is provisionally intended to be the respective statute of limitations for each claim, with Plaintiff reserving the right to invoke the equitable tolling doctrine based on the discovery rule or other bases as discovery and the case progresses.

[57] The term "Class" as used throughout includes both the Class and Subclasses unless otherwise specified.

available reports, Class members number in the hundreds of thousands and likely are many million. Subclass members are likely in the tens or hundreds of thousands.  All Class members may be notified of the pendency of this action by reference to Robinhood's records, publication notice, or by other alternative means.

174.  **Commonality**: Numerous questions of law or fact are common to the claims of Plaintiffs and members of the proposed Class.  These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to the following:

a.  How and why the Outages occurred;

b.  Whether Robinhood's infrastructure was adequate;

c.  Whether Robinhood maintained adequate business continuation and contingency plans to provide financial services during the Outages;

d.  Whether Robinhood complied with its legal, regulatory, and licensing requirements;

e.  Whether Robinhood's conduct is governed by California law;

f.  Whether Robinhood's conduct in connection with the Outages was negligent (or grossly negligent);

g.  Whether Robinhood breached its fiduciary duties to Plaintiffs and Class members;

h.  Whether Robinhood has breached (and continues to breach) its contracts with Robinhood customers and/or the implied covenant of good faith and fair dealing;

i.  Whether Robinhood's conduct violates California's Unfair Competition Law, Bus. & Prof. Code Section 17200, *et seq*.;

j.  Whether Robinhood was unjustly enriched by its conduct;

k.  Whether Plaintiffs and the other Class members were injured by Robinhood's conduct, and if so, the appropriate measure of damages, restitution, disgorgement and other monetary relief; and

l.  Whether Plaintiffs and the other Class members are entitled to injunctive and declaratory relief.

175.  **Typicality**: The claims of the named Plaintiffs are typical of the claims of the

proposed Class in that the named Plaintiffs were all Robinhood customers during the Outages, have sustained damages and other harms as a result of the Outages, and are at continuing risk of further harm due to Robinhood's conduct.

176.     **Adequate Representation**: Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflicts with any other Class members. Plaintiffs have retained competent counsel experienced in prosecuting complex class actions, including those involving technology and financial services, and they will vigorously litigate this class action.

177.     **Predominance and Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy.  Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant.  Additionally, given the amount of damages sustained by most individual Class members, few proposed Class members could or would sustain the economic burden of pursuing individual remedies for Robinhood's wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

178.     Class certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Robinhood.

179.     Class certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

180.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Robinhood has acted or refused to act on grounds

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole.

181.    Class certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiffs is insufficient to make litigation addressing Robinhood's conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

182.    Class certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.  As indicated above, subclasses pursuant to Fed. R. Civ. P. 23(c)(5) may be warranted.

## CLAIMS FOR RELIEF[58]

## COUNT I

### Negligence

183.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

184.    As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

185.    Robinhood unlawfully breached its duties by, among other things, failing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to provide timely access to trading services

---

[58] All Counts are alleged against each Defendant unless otherwise specified.

during the Outages; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to keep records of trades (including attempted trades); by failing to provide timely access to customers' accounts, securities and funds; by failing to have a supervisory control system that would have identified and prevented the Outages; by failing to have adequate business contingency and continuity plans to ensure timely service in the event of an outage; by failing to have any back-up plans to receive and process customers' orders during the Outages; by having no adequate means for customers to get assistance during the Outages; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

186.    As set forth below, Robinhood's conduct was so want of even scant care that its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, rendering Robinhood not just negligent, but grossly negligent.

187.    Robinhood's negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for Robinhood's breach of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT II

### Gross Negligence

188.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

189.    As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

190.    Robinhood unlawfully breached its duties by, among other things, failing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to provide timely access to trading services

during the Outages; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to keep records of trades (including attempted trades); by failing to provide timely access to customers' accounts, securities and funds; by failing to have a supervisory control system that would have identified and prevented the Outages; by failing to have adequate business contingency and continuity plans to ensure timely service in the event of an outage; by failing to have any back-up plans to receive and process customers' orders during the Outages; by having no adequate means for customers to get assistance during the Outages; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

191.     Robinhood's conduct as set forth in this Complaint was want of even scant care and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct.  Indeed, Robinhood essentially abandoned its customers altogether during the Outages, a standard of care so far below what is required for business engaging in time sensitive financial services that it amounts to a complete abandonment of its duties.  Moreover, Robinhood continues to experience regular outages which indicates that it has failed to implement adequate infrastructure, is still not compliant with applicable regulatory authorities, still has no meaningful business contingency or continuity plan, and still has no backup system for customers to access their accounts and execute timely transactions and trades.  Robinhood's reckless disregard for its customers continues to fall so far below the standard of care required of it that it constitutes gross negligence.

192.     Robinhood's gross negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused their losses and damages that they would not have occurred but for Robinhood's gross breaches of its duty of due care.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT III

### Breach of Fiduciary Duty

193.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

194.     As a provider of financial services and a registered securities investment broker-dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf.  As a broker-dealer, Robinhood provides securities trading services by taking, entering, and executing orders, provides information and advice to customers on investments and investment strategies (although it disclaims doing so), and even executes transactions within their accounts when not specifically requested by investors.

195.     Robinhood also maintains discretionary control over customer accounts as commemorated in its Customer Agreement, and takes commissions for exercising such discretionary actions (attached as **Exhibits B, C** & **D**.):

> Robinhood may, but are not obligated to, notify Me of any upcoming expiration or redemption dates, or take any action on My behalf without My specific instructions except as required by law and the rules of regulatory authorities. I acknowledge that Robinhood may adjust My Account to correct any error. If My Account has an option position on the last trading day prior to expiration, which is one cent or more in the money, Robinhood Financial will generally exercise the option, on My behalf. However, Robinhood Financial reserves the right at Its discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. I will be charged a commission for any such transaction.

Robinhood also may "in its sole discretion" buy or sell securities and liquidate accounts in any circumstance, whatsoever, "including, but not limited to" certain enumerated events such as having insufficient funds.  Accordingly, Robinhood expressly assumes all the fiduciary responsibilities associated with its retention of discretion to exercise trades and other transactions with or without customer direction.

196.     Additionally, because Robinhood provides securities trading services through web and app-based services, it maintains a specific fiduciary duty to ensure such web and app-based services are fundamentally reliable and unlikely to malfunction and cause their customers harm and damages, particularly when Robinhood also does not maintain adequate infrastructure and back-up services or other means to take timely actions on accounts in the event of an outage.

197.     Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among

- 36 -

other things, failing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to provide timely access to trading services during the Outages; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to keep records of trades (including attempted trades); by failing to provide timely access to customers' accounts, securities and funds; by failing to have a supervisory control system that would have identified and prevented the Outages; by failing to have adequate business contingency and continuity plans to ensure timely service in the event of an outage; by failing to have any back-up plans to receive and process customers' orders during the Outages; by having no adequate means for customers to get assistance during the Outages; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

198.    Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT IV

### Breach of Contract

### (Alleged solely against Defendants Robinhood Financial and Robinhood Securities)

199.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

200.    In order to use the Robinhood trading platform, a potential customer must enter into the Customer Agreement with Robinhood.  The operative Customer Agreement at the time of the Outages, is attached as **Exhibit B**.  Since the Outages, Robinhood has twice amended the operative Customer Agreement.  The April 28, 2020 Customer Agreement is attached as **Exhibit C** and the June 22, 2020 Customer Agreement is attached as **Exhibit D**.  Each of these Customer Agreements mandates that Robinhood's accounts and trading activities will be subject to all applicable state and

federal laws and regulations, including those set by self-regulatory organizations. *See, e.g.*, Ex. B at ¶ 11.  Each Customer Agreement also selects California choice of law to apply.  *Id*. at ¶ 36. Additionally, Robinhood's customers who are Gold members are subject to the Gold User Agreement attached as **Exhibit E**, Robinhood's customers who trade on margin are subject to the Margin and Short Account Agreement attached as **Exhibit F**, and Robinhood's customers who trade options are subject to the Options Agreement attached as **Exhibit G**.  Most of the contracts expressly refer and incorporate each others' terms by reference, including by hyperlink. *See, e.g.*, **Exhibit F**, at p. 7, ¶ 17.  All Robinhood customers are also subject to the Robinhood Terms & Conditions, a copy of which is attached as **Exhibit H,** and Robinhood's Business Continuity Plan Summary is attached as **Exhibit I**.  Each of these standardized agreements are contracts of adhesion that are imposed on Robinhood's customers as conditions of use and are not subject to negotiation.

201.    Robinhood furnished consideration to Plaintiffs and Class members in the form of access to Robinhood's online trading platform, enabling them to trade securities and options listed on U.S. securities exchanges.  In exchange, Robinhood received consideration from Plaintiff and Class members including, but not limited to, order flow data, which it sold to market makers to generate revenue, interest generated on cash balances in accounts, commissions and fees based on trades placed, interest on margin extensions, and fees for Gold Membership access.

202.    Robinhood breached its contracts with customers by failing to perform under the contracts entirely, and by, among other things, failing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to provide timely access to trading services during the Outages; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to keep records of trades (including attempted trades); by failing to provide timely access to customers' accounts, securities and funds; by failing to have a supervisory control system that would have identified and prevented the Outages; by failing to have adequate business contingency and continuity plans to ensure timely service in the event of an outage; by failing to have any back-

up plans to receive and process customers' orders during the Outages; by having no adequate means for customers to get assistance during the Outages; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

203.   Robinhood's Customer Agreement purports to limit liability for "temporary" service interruptions due to events like maintenance, but it specifically distinguishes that purported limitation of liability from the circumstances that led to the lengthy Outages which were attributable solely to Robinhood's conduct: "I agree that Robinhood will not be responsible for temporary interruptions in service due to maintenance, Website or App changes, or failures, nor shall Robinhood be liable for extended interruptions due to failures beyond our control, including but not limited to the failure of interconnecting and operating systems, computer viruses, forces of nature, labor disputes and armed conflicts." *See, e.g.*, Ex. B at ¶ 17.  As Robinhood admitted both during and after the extended Outages, they were not attributable to "failures beyond our control" but the lack of adequate infrastructure, foresight, and planning.  The Outages at issue in this case were foreseeable and preventable, and in breach of the parties' agreements.

204.   Robinhood's failure to perform and its breaches of the Customer Agreement and applicable contracts resulted in damages and losses to Plaintiffs and Class members and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

205.   Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood has sufficient infrastructure to manage their accounts and trading activity in the future.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Alleged solely against Robinhood Financial and Robinhood Securities)

206.   Plaintiffs hereby incorporate by reference the factual allegations contained herein.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

207.   As set forth above, Plaintiffs, Class members and Robinhood are parties to the Customer Agreement and related contracts.

208.   Robinhood unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the Customer Agreement and related contracts by, failing to perform under the contracts entirely, and by, among other things, failing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to provide timely access to trading services during the Outages; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to keep records of trades (including attempted trades); by failing to provide timely access to customers' accounts, securities and funds; by failing to have a supervisory control system that would have identified and prevented the Outages; by failing to have adequate business contingency and continuity plans to ensure timely service in the event of an outage; by failing to have any back-up plans to receive and process customers' orders during the Outages; by having no adequate means for customers to get assistance during the Outages; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

209.   Robinhood's conduct has breached the implied covenant of good faith and fair dealing because it has caused Plaintiffs and Class members' harm, losses, and damages, and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

210.   Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood has sufficient infrastructure to manage their accounts and trading activity in the future.

**COUNT VI**

**Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

211.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

212.    Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq.*, because Robinhood's conduct is unlawful and unfair as herein alleged.

213.    Plaintiffs, the members of the Class, and Robinhood are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

214.    The UCL prohibits any unlawful and unfair business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the provision of its financial and investment broker services.

215.    **Unlawful prong:**  Robinhood's conduct, as described within, violated the UCL's unlawful prong because it: (1) constitutes negligence and/or gross negligence; (2) constitutes a breach of fiduciary duty; (3) constitutes a breach of contract and/or a breach of the implied covenant of good faith and fair dealing; (4) it violated applicable regulatory laws and guidance such as the SEC's Staff Legal Bulletin No. 8 and the NASD's Notice to Members ("NTM") 99-11 that required broker-dealers to have sufficient technological trading capacity over 20 years ago, FINRA Rule 2232 by failing to maintain accurate records of accounts and trade confirmations (including attempted trades), Rule 3120, by failing to have a sufficient supervisory system to gain compliance with regulatory laws, Rule 4370 which requires Robinhood to have a contingency plan in the case of emergency or business disruption, and Rule 5310 which requires best execution of orders fully and promptly; and (5) has unlawfully and unjustly enriched Robinhood.

216.    **Unfair prong:**  Robinhood's conduct, as described within, violated the UCL's unfair prong because its conduct violates established public policy intended to regulate financial services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit. The utility of Robinhood's conduct in failing to maintain and implement adequate infrastructure and by breaching its duties and obligations to Plaintiffs and Class members is far outweighed by the gravity of harm to consumers who have now incurred losses and damages they would not have otherwise.

217.   Plaintiffs have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein.

218.   The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other Counts of this Complaint. *See* Cal. Bus. & Prof. Code § 17205.

219.   As a direct and proximate cause of Robinhood's conduct, which constitutes unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.  Additionally, because Plaintiffs and Class members continue to have accounts and investments with Robinhood and intend to use Robinhood's services in the future, injunctive relief is warranted.

## COUNT VII

### Unjust Enrichment

220.   Plaintiffs hereby incorporate by reference the factual allegations contained herein.

221.   By its wrongful conduct described herein, Robinhood has obtained a benefit from Plaintiffs and Class members that includes, but is not limited to, maintaining their accounts, receiving their personal data, receiving payments for order flow, maintaining deposited funds, charging and/or receiving interest on accounts and margin balances, charging and/or receiving fees, commissions and Gold Membership fees, and increased capital fundraising due to the high number of new and continuing users of its platform, which also drives up Robinhood's valuation.

222.   Since Robinhood's profits, benefits, and other compensation were obtained by improper means, Robinhood was unjustly enriched at the expense of Plaintiffs and Class members and is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized.

223.    Plaintiffs and Class members seek an order of this Court requiring Robinhood to refund, disgorge, and pay as restitution any profits, benefits, and other compensation obtained by Robinhood from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## COUNT VIII

### Declaratory Relief

224.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

225.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the laws and legal obligations described in this Complaint.

226.    An actual controversy has arisen.  Plaintiffs allege that Robinhood is not complying with its fiduciary duties and obligations under the Customer Agreement and regulatory requirements, and has not and does not maintain sufficient infrastructure necessary to provide the financial services it must do so in a complete and timely manner.

227.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Robinhood owed and continues to owe a legal duty to comply with its agreements as well as regulatory requirements to maintain adequate infrastructure to handle consumer demand and execute trades in a complete and timely manner; and

b.    Robinhood continues to breach this legal duty by failing to implement and maintain reasonable measures to prevent Outages and provide alternative means for customers to make timely financial transactions if and when they do occur.

228.    The Court also should issue corresponding injunctive relief requiring Robinhood to employ adequate quality control consistent with industry standards, regulatory requirements, and

- 43 -

the parties' agreements.

## PRAYER FOR RELIEF

**THEREFORE,** Plaintiffs seeks judgment against Robinhood, as follows:

A.      Certifying the Class and naming Plaintiffs as representatives of the Class and/or Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class members;

B.      Finding that Robinhood's conduct violates the statutes and laws referenced herein;

C.      Finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.      Granting restitution, disgorgement and other equitable monetary relief to Plaintiffs and the Class;

E.      Granting declaratory and injunctive relief to enjoin Robinhood from engaging in the unlawful practices described in this Complaint;

F.      Granting compensatory and/or punitive damages, the amount of which is to be determined at trial;

G.      Granting pre- and post-judgment interest on all amounts awarded;

H.      Granting injunctive relief as pleaded or as the Court may deem proper;

I.       Awarding Plaintiffs and the Class reasonable attorneys' fees and expenses and costs of suit; and

J.       Granting further relief as this Court may deem proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: June 30, 2021                            Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**          **COTCHETT, PITRE & MCCARTHY, LLP**

*/s/ Matthew B. George*
Matthew B. George (SBN 239322)            */s/ Anne Marie Murphy*
Maia C. Kats (admitted *pro hac vice*)          Anne Marie Murphy (SBN 202540)
Laurence D. King (SBN 206423)              Mark C. Molumphy (SBN 168009)
Mario M. Choi (SBN 243409)                 Noorjahan Rahman (SBN 330572)

- 44 -

1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*mgeorge@kaplanfox.com*
*mkats@kaplanfox.com*
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

Tyson C. Redenbarger (SBN 294424)
Julia Peng (SBN 318396)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
*amurphy@cpmlegal.com*
*mmolumphy@cpmlegal.com*
*nrahman@cpmlegal.com*
*tredenbarger@cpmlegal.com*
*jpeng@cpmlegal.com*

*Co-Lead Interim Class Counsel for Plaintiffs*

**GIBBS LAW GROUP LLP**
Steve Lopez (SBN 300540)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
*sal@classlawgroup.com*

*Liaison Counsel for Plaintiffs*

**MEYER WILSON**
Courtney M. Werning (admitted *pro hac vice*)
Matthew R. Wilson (SBN 290473)
Chad Kohler (admitted *pro hac vice*)
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066
*cwerning@meyerwilson.com*
*mwilson@meyerwilson.com*
*ckohler@meyerwilson.com*

**BEASLEY ALLEN**
Leslie Pescia
W. Daniel Miles, III
James Eubank
Leslie L. Pescia
218 Commerce Street
Montgomery, AL 36104
Telephone: (800) 898-2034
Facsimile: (334) 965-7555
*leslie.pescia@beasleyallen.com*
*dee.miles@beasleyallen.com*
*james.eubank@beasleyallen.com*

**LITE DePALMA & GREENBERG**
Susana Cruz Hodge (admitted *pro hac vice*)
Joseph J. DePalma (admitted *pro hac vice*)
Steven J. Greenfogel (admitted *pro hac vice*)
Jeremy Nash (admitted *pro hac vice*)
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
*scruzhodge@litedepalma.com*
*jdepalma@litedepalma.com*
*sgreenfogel@litedepalma.com*
*jnash@litedepalma.com*

**WOLF HALDENSTEIN**
Rachele R. Byrd
Brittany N. DeJong
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
*byrd@whafh.com*
*dejong@whafh.com*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CARLSON LYNCH**
Jamisen Etzel (admitted *pro hac vice*)
Gary F. Lynch (admitted *pro hac vice*)
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone 412-322-9243
Facsimile 412-231-0246
*glynch@carlsonlynch.com*
*jetzel@carlsonlynch.com*

**SCOTT + SCOTT**
Erin Green Comite (admitted *pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone 860-537-5537
Facsimile: 860-537-4432
*ecomite@scott-scott.com*

**SHUMAKER LOOP & KENDRICK**
Brandon Taaffe (admitted *pro hac vice*)
Michael S. Taaffe (admitted *pro hac vice*)
240 South Pineapple Ave., 10th Floor
Sarasota, Florida 34236
Telephone: (941) 366-6660
Facsimile: (941) 366-3999
*btaaffe@shumaker.com*
*mtaaffe@shumaker.com*

**AHDOOT & WOLFSON**
Tina Wolfson (SBN 174806)
Theodore Maya (SBN 223242)
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
*twolfson@ahdootwolfson.com*
*tmaya@ahdootwolfson.com*

*Plaintiffs' Executive Committee*

**ANDRUS ANDERSON, LLP**
Jennie Lee Anderson (SBN 203586)
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

**EREZ LAW, PLLC**
Jeffrey Erez (admitted *pro hac vice*)
1 SE Third Avenue, Suite 1670
Miami, FL 33131
Telephone:  305-728-3320
Facsimile: 786-842-7549
*jerez@erezlaw.com*

**THE RESTIS LAW FIRM, P.C.**
William Richard Restis
402 W. Broadway, Suite 1520
San Diego, CA 92101
Telephone: 619-270-8383
*william@restislaw.com*

**SILVER LAW GROUP**
Scott Silver (*pro hac vice* to be submitted)
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 755-4799
Facsimile: (954) 755-4684
*ssilver@silverlaw.com*

**CARLSON LYNCH**
Todd D. Carpenter (SBN 234464)
(Eddie) Jae K. Kim (SBN 236805)
1350 Columbia St., Ste. 603
San Diego, CA 92101
Telephone: 619-762-1900
Facsimile: 619-756-6991
*tcarpenter@carlsonlynch.com*
*ekim@carlsonlynch.com*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney (to be admitted *pro hac vice*)
Kevin G. Cooper (to be admitted *pro hac vice*)
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114
*guiney@whafh.com*
*kcooper@whafh.com*

**SCOTT+SCOTT ATTORNEYS AT**

**MAURIELLO LAW FIRM, APC**

- 46 -

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**LAW LLP**
Joseph P. Guglielmo (admitted *pro hac vice*)
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
*jguglielmo@scott-scott.com*

Thomas D. Mauriello (SBN 144811)
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Telephone: (619) 940-1606
Facsimile: (949) 606-9690
*tomm@maurlaw.com*

**GRABAR LAW OFFICE**
Joshua H. Grabar (to be admitted pro *hac vice*)
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Telephone: 267-507-6085
Facsimile: 267-507-6048
*jgrabar@grabarlaw.com*

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky (to be admitted *pro hac vice*)
Timothy J. MacFall (to be admitted *pro hac vice*)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
*sdr@rl-legal.com*
*tjm@rl-legal.com*

**THE GUILIANO LAW GROUP, P.C.**
Nicholas J. Guiliano (to be admitted *pro hac vice*)
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Telephone: (215) 413-8223
Facsimile: (215) 660-5490
*nick@nicholasguiliano.com*

**ROSMAN & GERMAIN LLP**
Daniel L. Germain (SBN 143334)
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile:   (818) 788-0885
*Germain@Lalawyer.com*

**THE WEISER LAW FIRM, P.C.**
James M. Ficaro (*pro hac vice* to be requested)
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
*jmf@weiserlawfirm.com*

*Plaintiffs' Counsel*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY