**COTCHETT, PITRE & MCCARTHY, LLP**
Anne Marie Murphy (SBN 202540)
Mark C. Molumphy (SBN 168009)
Noorjahan Rahman (SBN 330572)
Tyson C. Redenbarger (SBN 294424)
Julia Q. Peng (SBN 318396)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
*amurphy@cpmlegal.com*
*mmolumphy@cpmlegal.com*
*nrahman@cpmlegal.com*
*tredenbarger@cpmlegal.com*
*jpeng@cpmlegal.com*

**KAPLAN FOX & KILSHEIMER LLP**
Matthew B. George (SBN 239322)
Kathleen A. Herkenhoff (SBN 168562)
Laurence D. King (SBN 206423)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*mgeorge@kaplanfox.com*
*kherkenhoff@kaplanfox.com*
*lking@kaplanfox.com*

Interim Co-Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: Robinhood Outage Litigation | Master File No. 3:20-cv-01626-JD <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORADUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:  January 13, 2021 <br> Time:  10:00 a.m. <br> Judge:  Hon. James Donato <br> Ctrm:  11, 19th Floor |

## <u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>

# NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 13, 2021 at 10:00 a.m., or at the Court's convenience, before the Honorable James Donato, United States District Judge for the Northern District of California, at the San Francisco Courthouse, 450 Golden Gate Avenue, Courtroom 11, 19th Floor, San Francisco, CA 94102, Plaintiffs will and hereby do move this Court for an entry of an Order in the above-captioned action (the "Action") against Defendants Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), certifying pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure a Class defined as: "All Robinhood account holders within the United States with a funded account and at least one equity or option position during the Outage on March 2, 2020 (the "Class")." In addition, or in the alternative, Plaintiffs seek certification of sub-classes comprised of Robinhood's account holders in the United States who: (1) closed a position on March 3, 2020, at a loss relative to the Volume Weighted Average Price "VWAP" during the March 2 and 3, 2020 Outages ("VWAP Subclass"); (2) held SPDR S&P 500 ("SPY") options expiring on March 2, 2020 and experienced a loss relative to the VWAP during the March 2, 2020 Outage ("SPY Option Subclass"); (3) who experienced a failed equity trade during the Outages at a loss relative to the price at the end of the Outages and/or the transaction price obtained through March 4, 2020 and/or March 10, 2020 ("Failed Trade Subclass"); (4) held Gold membership subscriptions during the Outages ("Gold Subclass"); and (5) paid margin interest fees during the Outages ("Margin Subclass"). Plaintiffs also seek an order appointing Plaintiffs as Class Representatives of the Class and Subclasses; and appointing Anne Marie Murphy of Cotchett Pitre & McCarthy LLP ("CPM") and Matthew George of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") as Class Counsel with Gibbs Law Group as Liaison Counsel and an Executive Committee as set forth in the proposed order filed herewith. ECF No. 65.

Plaintiffs' Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Joint Declaration of Anne Marie Murphy and Matthew George in Support of Plaintiffs' Motion for Class Certification, the Appendix of Plaintiffs'

- 1 -

Declarations; the Declarations of J. Bradley Bennett, Peter Vinella, and Scott Walster; and the [Proposed] Order Granting Plaintiffs' Motion for Class Certification; all exhibits and appendices to such documents; any papers filed in reply; any argument as may be presented; and all other matters of records in this matter.

### STATEMENT OF ISSUES

The issues to be decided on this Motion are:

1.     Whether to certify the Classes proposed by Plaintiffs, which satisfy the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (3);

2.     Whether to appoint plaintiffs Daniel Beckman, Joseph Gwaltney, Emma Jones, Leila Kuri, Jared Leith, Omeed Mahrouyan, Mahdi Heidari Moghadam, Howard Morey, Colin Prendergast, Raghu Rao, Michael Riggs, Kevin Russel, Jason Steinberg, Jared Ward, and Mengni Xia as Class Representatives; and

3.     Whether to appoint CPM and Kaplan Fox as Co-Lead Class Counsel with Gibbs Law Group as Liaison Counsel and an Executive Committee.

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

I.    INTRODUCTION ....................................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................................2

      A.    Robinhood's March 2020 Outages.................................................................................2

            1.    March 2-3 2020 Outage .......................................................................................2

            2.    March 9, 2020 Outage..........................................................................................3

      B.    Customers are Unable to Reach Robinhood During the Outages ...............................4

      C.    Senior Management Failed to Provide Sufficient Leadership and Robinhood
            Lacked Established Processes in Response to the Outages........................................5

      D.    Robinhood Had a History of Outages and Was Aware of the Deficiencies that
            Materially Contributed to the Outages in March 2020..............................................7

      E.    Robinhood will Continue to Have Outages Due to Its Weak Infrastructure and
            Prioritization of Product Development and Profit Over Sound Operations ..............8

            1.    Robinhood's Infrastructure Does Not Conform to Industry Standard........8

            2.    Robinhood's Conflicting Priorities Place Profit and Development of
                  New Features Ahead of Strengthening of Their Already Existing
                  Systems ................................................................................................................9

      F.    Robinhood Silences Incongruent Opinions that Stray from Robinhood's
            "Cowboy Culture".....................................................................................................10

      G.    Robinhood's Senior Management is Woefully Unprepared to Operate a
            Securities Firm with Millions of Clients .................................................................11

      H.    Robinhood's Lack Governance Violated FINRA Regulations and Contributed
            to the Outages ...........................................................................................................13

III.  ARGUMENT ........................................................................................................................14

      A.    Legal Standard, Proposed Class Definition, and Choice of Law ............................14

      B.    Plaintiffs' Case Satisfies Rule 23's Requirements ..................................................15

            1.    The Proposed Classes are Sufficiently Numerous .....................................15

            2.    Plaintiffs' Are Adequate Representatives with Typical Claims ................15

            3.    Common Issues of Law and Fact Predominate Plaintiffs' Case................16

IV.   CONCLUSION......................................................................................................................25

**Cases**

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997)................................................................................................................17

*Bally v. State Farm Life Ins. Co.,*
   |335 F.R.D. 288 (N.D. Cal. 2020)........................................................................................19

*Bebault v. DMG Mori USA, Inc.,*
   2020 WL 2065646 (N.D. Cal. Apr. 29, 2020)......................................................................16

*Brickman v. Fitbit, Inc.,*
   2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) .....................................................................25

*Caldwell v. UnitedHealthcare Ins. Co.,*
   2020 WL 7714394 (N.D. Cal. Dec. 29, 2020) .....................................................................18

*Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc,*
   769 F.2d 561 (9th Cir. 1985) ...............................................................................................19

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.,*
   2 Cal. 4th 342372 (1992) ....................................................................................................20

*Chinitz v. Intero Real Estate Services,*
   2020 WL 7391299 (N.D. Cal. July 22, 2020).....................................................................24

*CRST Van Expedited, Inc. v. Werner Enters., Inc.,*
   479 F.3d 1099 (9th Cir. 2007) .............................................................................................20

*Grace v. Apple, Inc.,*
   328 F.R.D. 320 (N.D. Cal. 2018).........................................................................................21

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) .............................................................................................17

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.,*
   61 Cal.4th 988 (2015) ..........................................................................................................21

*Hensley-Maclean v. Safeway, Inc.,*
   2014 WL 1364906 (N.D. Cal. Apr. 7, 2014) ......................................................................21

*In re Chase Bank USA, N.A. Check Loan Contract Litig.,*
   274 F.R.D. 286 (N.D. Cal. 2011).........................................................................................19

*In re Facebook, Inc., Consumer Priv. User Profile Litig.,*
   402 F. Supp. 3d 767 (N.D. Cal. 2019)...........................................................................17, 18

*In re Pomona Valley Med. Group, Inc.,*
   476 F.3d 665 (9th Cir. 2007) ...............................................................................................20

*Izsak v. Wells Fargo Bank, N.A.,*
   2014 WL 1478711 (N.D. Cal. Apr. 14, 2014) ....................................................................20

*Maldonado v. Apple, Inc.,*
   333 F.R.D. 175 (N.D. Cal. 2019).........................................................................................19

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................ 14

*McGill v. Citibank, N.A.*,
   2 Cal. 5th 945 (2017) ...................................................................................... 24

*McMillion v. Rash Curtis & Assoc.*,
   2017 WL 3895764 (N.D. Cal. Sept. 6, 2017) ................................................ 24

*Meek v. SkyWest, Inc.*,
   2021 WL 4461180 (N.D. Cal. Sept. 29, 2021) .............................................. 17

*Mihara v. Dean Witter & Co., Inc.*
   619 F.2d 814 (9th Cir. 1980) .......................................................................... 17

*Milliner v. Mut. Sec., Inc.*,
   207 F. Supp. 3d 1060 (N.D. Cal. 2016) .................................................... 17, 18

*Newman v. First California Co.*,
   47 Cal. App. 3d 60 (Cal. Ct. App. 1975) .................................................. 17, 19

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .......................................................................... 15

*Qingdao Tang-Buy Int'l Imp. & Exp. Co., Ltd. v. Preferred Secured Agents, Inc.*,
   2016 WL 6524396 (N.D. Cal. Nov. 3, 2016) ................................................ 19

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ................................................................... 17, 24

*Schuman v. Microchip Tech. Inc.*,
   2020 WL 887944 (N.D. Cal. Feb. 24, 2020) ................................................. 18

*Smith v. Keurig Green Mt., Inc.*,
   2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) .............................................. 21

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ..................................................................... 15, 16

*Tuttle v. Sky Bell Asset Management, LLC*,
   2012 WL 440393 (N.D. Cal. Feb. 10, 2012) ............................................ 17, 18

*Twomey v. Mitchum, Jones & Templeton, Inc.*,
   262 Cal. App. 2d 690 (Cal. Ct. App. 1968) ................................................... 19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... 16, 17

*Wolin v. Jaguar Land Rover N. Am. LLC*,
   617 F.3d 1168 (9th Cir. 2010) ........................................................................ 15

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ........................................................................ 14

**Statutes**

California Business & Professions Code
  §§17200, *et seq.* .......................................................................................15
  §§17200-203 ...............................................................................................20
  §17203 ........................................................................................................24

**Regulations**

17 Code of Federal Regulations
  §240.17a-3 ..............................................................................................20, 21

**Rules**

Federal Rules of Civil Procedure
  Rule 23 ........................................................................................................15
  Rule 23(a) ................................................................................................2, 14
  Rule 23(a)(2) ..............................................................................................16
  Rule 23(a)(3) ..............................................................................................15
  Rule 23(a)(4) ..............................................................................................15
  Rule 23(b) ...................................................................................................14
  Rule 23(b)(2) .....................................................................................2, 14, 24
  Rule 23(b)(3) ..............................................................................2, 14, 16, 17

**Treatises**

Newberg on Class Actions
  §4:38 (5th ed. 2020).....................................................................................24

**Other Authorities**

Financial Industry Regulatory Authority
  Rule 2010 ...............................................................................................5, 20
  Rule 2232 .............................................................................................20, 21
  Rule 3110 ...................................................................................................20
  Rule 3120 ...................................................................................................20
  Rule 4370 .............................................................................................13, 20
  Rule 4530(d) .................................................................................................5
  Rule 5310 ...................................................................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

By early 2020, Robinhood—a Silicon Valley venture capital backed securities trading startup—had enticed millions of customers to its app by claiming to "democratize" the financial industry, using a slick, game-like interface, and waiving traditional commission fees. Many of Robinhood's customers were new investors lured by Robinhood into significant margin accounts and risky, time-sensitive options trading. Robinhood's rapid growth exacerbated troubling problems with its technology infrastructure and inexperienced management, culminating in a series of severe outages.

On March 2, 2020, Robinhood's platform failed for an entire day; 12 million customers lost access to their accounts on a day of high returns. Robinhood's outage was historic in size and scope. No brokerage, let alone one with that many customers, has ever failed for so long. But as Plaintiffs and Class Members helplessly watched their orders fail and options expire worthless, Robinhood could not right the ship. The outage extended into the next trading day, March 3, because of a lack of disaster recovery planning and fundamental issues with platform design that were known problems but long neglected in favor of flashy customer-facing features. Mere days later, on March 9, Robinhood was down again, this time because it could not be bothered to conduct a routine, simple test on a minor coding change—a problem that had plagued Robinhood before.

Plaintiffs filed suit in over a dozen class actions that were consolidated into this proceeding. The facts revealed through discovery were astonishing and confirmed all of Plaintiffs' chief allegations. Robinhood has critical foundational issues from top to bottom—each directly contributing to the Outages. At the top, Robinhood's co-founders Vlad Tenev and Baiju Bhatt had no pertinent experience running a brokerage, let alone one with over 12 million customers. They largely ignored or delegated responsibilities to a revolving door of executives and Florida-based compliance personnel who also lacked pertinent experience. When deposed, key employees revealed an alarming lack of knowledge about standard industry practices, particularly in the areas of brokerage operations, technology infrastructure, regulatory requirements, and disaster recovery.

The "brokerage" was run like a tech startup by inexperienced software engineers who either

joined after brief stints at Silicon Valley tech companies or were recruited prior to graduating college. These engineers built a cobbled-together trading platform using open-source code lacking in important industry standard protections. Robinhood's platform had a long history of outages pre-March 2020 and was undone on March 2 because a simple file descriptor limit was exceeded. Testimony and documents reveal a highly disorganized company with a "cowboy culture" that an engineer said is "f'ed up all the way up." Aspiring to be a tech "disruptor" Robinhood spurned regulatory requirements and industry best practices in favor of shortcuts geared towards increasing users and company valuation in anticipation of an IPO, all at the expense of sound operations and diligent compliance. In fact, Robinhood's problems have continued: during the pendency of this case, outages and technology issues persisted and regulatory inquiries have led to historic fines.

Plaintiffs move for class certification, supported by a strong factual record that Robinhood breached its contracts and fiduciary obligations, ran afoul of its regulatory requirements, and acted in a reckless, profit-driven manner amounting to gross negligence and unfair business practices under California law. Plaintiffs present a fulsome damages analysis demonstrating losses well into the tens of millions, before punitive damages and interest. Plaintiffs also seek injunctive relief to reduce the risk of future outages. Put plainly, Robinhood needs the Court's intervention to protect customers. Accordingly, Plaintiffs seek an order certifying the class action under Rules 23(a), 23(b)(2) and (3) and look forward to presenting their case at trial.

## II.     FACTUAL BACKGROUND

### A.     Robinhood's March 2020 Outages

#### 1.     March 2-3 2020 Outage

Between March 2 and 3, 2020, Robinhood experienced an Outage[1] that began just after Monday's market open and extended well into Tuesday rendering systems nonfunctional or inaccessible to all 12.4 million customers. Joint Declaration of Anne Marie Murphy and Matthew George, Ex. 14; Declaration of Scott Walster ("Walster Decl."), Ex. C at ¶¶27, 36. At approximately

---

[1] Plaintiffs will refer the March 2, 3, and 9, incidents as "Outage" or "Outages."

9:31 a.m. EST[2] on March 2, Robinhood's trading platform completely stopped functioning. Ex. 14.[3] Robinhood did not restore full functionality until March 3 at 11:23 a.m. *Id.* Customers could not enter new orders, alter placed orders, cancel orders, or access the funds in their Robinhood account. *Id.* A Robinhood spokesperson admitted the Outages were due to "instability in a part of our infrastructure that allows our systems to communicate with each other."[4] Ex 16; Ex. 17 at RH_OT_CIV_00009342. Employees told the New York Times that Robinhood "had underinvested in technology and moved too quickly rather than carefully" and that Robinhood "failed to provide adequate guardrails and technology to support its customers." [5]

Discovery has revealed that the root cause for the March 2-3 Outage was simpler than Robinhood dared publicly admit: a file descriptor ("FD") limit was exceeded in a distributed messaging system at Robinhood. The failure of this one periphery system, Kafka, resulted in the cascading failure of Robinhood's entire infrastructure. Ex. 1 (Dellamaggiore Tr. 82:23-85:2); Ex. 12 (Rule 30(b)(6) Agarwal Tr. 41:16-45:18); Ex. 14 at RH_OT_CIV_00020734-35. The two engineers tasked with increasing the file descriptor limit in Kafka applied their fix to the *wrong version* of the file. Ex. 1 (Dellamaggiore Tr. 94:18-96:2). Therefore, the Outage continued to March 3, despite Robinhood having identified and "fixed" the issues in Kafka. "The script to update FDs was applied via the wrong config file and the change was not validated. If this change was applied, it's highly likely we wouldn't have experienced the same outage on Tuesday." Ex. 1 (Dellamaggiore Tr. 170:2-13); Ex. 14 at RH_OT_CIV_00020737; Ex. 18 at RH_OT_CIV_00017230. Robinhood had no contingency protocol or supervision in place that would 1) allow correct implementation of their fix and 2) remediate the engineering mishap.

### 2.   March 9, 2020 Outage

---

[2] All times are Eastern Standard Time, unless otherwise indicated.

[3] All cites to Ex._ are in reference to exhibits from the Joint Declaration unless otherwise specified.

[4] *See* https://www.theverge.com/2020/3/3/21163048/robinhood-outages-major-2-days-leapyear-investing (last visited Oct.21, 2021).

[5] Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results,* The New York Times (July 8, 2020) https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (last visited Oct.21, 2021).

Notwithstanding Robinhood's explanations and apologies, its trading platform crashed again the very next Monday. Ex. 15. On March 9, users again found themselves unable to access their accounts or transact on the markets due to an outage of Robinhood's systems from 9:23 a.m. to 10:13 a.m. *Id.* at RH_OT_CIV_00020724. The March 9 Outage was caused by the preventable crash of Robinhood's system, ▮▮▮▮▮▮▮▮▮▮▮ because it could not process the information received from Virtu Financial ("Virtu"), one of Robinhood's exchange venues. "This was the unintended result of a change to our communications with Virtu. In requesting a change to an existing FIX tag (one field in the communication language we share with our venues), Virtu also began sending a new FIX tag with values we were not prepared to receive."). Ex. 1 (Dellamaggiore Tr. 193:19-196:15); Ex. 9 (Swartwout Tr. 119:21-120:3); Ex. 15 at RH_OT_CIV_00020724). Contrary to standard industry practice, Robinhood did not conduct *any* testing on Virtu's code and instead directly incorporated Virtu's change into production, causing Robinhood's outage on March 9. Ex. 9 (Swartwout at 80:9-83:7); Ex. 19 at RH_OT_CIV_00059704). "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During the Outage, customers were unable to use Robinhood's services and could not place new orders, cancel existing orders, or receive updates for placed orders. Ex. 15 at RH_OT_CIV_00020724.

**B.    Customers are Unable to Reach Robinhood During the Outages**

During the Outages, Robinhood failed to provide means for customers to place orders, access funds, or even communicate with Robinhood because Robinhood did not maintain live phone support. Ex. 5 (Wolff Tr. 40:17-24, 143:11-144:14, 206:20-207:12); Ex. 11 (Rule 30(b)(6) Dusseault Tr. 68:1-7, 81:19-82:23, 175:14-176:14); Ex. 14; Ex. 15; Ex. 19 at RH_OT_CIV_00059708-09; Ex. 20; Ex. 21; Ex. 22. There was no option for customers to reach Robinhood FINRA registered personnel to place orders. *Id*. No lines of communication to Robinhood were operational during the Outages. Robinhood's customer service phone line directed customers straight to voicemail; and discovery confirmed that Robinhood never staffed the phonelines with representatives. Ex. 5 (Wolff Tr. 19:15-20:7); Ex. 11 (Rule 30(b)(6) Dusseault Tr. 67:16-68:21, 81:19-82:23, 176:5-8); Ex. 23 at RH_OT_CIV 00059323-24.

Even the address support@robinhood.com that Robinhood told customers was the primary means to reach the company was inoperable during the Outages. Ex. 19 at RH_OT_CIV_00059347. The deluge of emails from frustrated investors attempting to trade was too much for Robinhood's email vendor Google to process, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

Robinhood's approximate median response time to customer emails on the days of the outage were: March 2, 2020 – 17.2 hours; March 3, 2020 – 39.2 hours; and March 9, 2020 – 20.1 hours. Ex. 21 at RH_OT_CIV_00103331. Robinhood has conceded that even if customers could have communicated with Robinhood through email during the Outages, these customers would have been unable to place trades. Ex. 19 at RH_OT_CIV_00059708. Frustrated investors resorted to contacting executives directly. Ex. 11 (Rule 30(b)(6) Dusseault Tr. 179:24-185:2); Ex. 27 ("I am currently dealing with over $30,000 in losses because of your outage and desperately need someone's help."); Ex. 28; Ex. 29. It was later revealed that Robinhood concealed customers' complaints pertaining to the Outages from FINRA in violation of FINRA Rules 2010 and 4530(d). Ex. 54 at 25. Desperate customers found a direct telephone number to reach Robinhood. Instead of helping these callers, Robinhood disconnected the line at 9:50 a.m. on March 2, without responding to these customers' voicemails. Ex. 23 at RH_OT CIV 00059323-24. Robinhood reconnected the line weeks later, on April 14. *Id.* at RH_OT CIV 00059324.

C. <u>**Senior Management Failed to Provide Sufficient Leadership and Robinhood Lacked Established Processes in Response to the Outages**</u>

Robinhood experienced at least thirteen (13) outages between 2018 and the March 2020 Outages and has continued to experience them regularly thereafter. Ex. 30. Robinhood's internal documents show that those prior outages did little to prepare Robinhood for the March Outages. Ex. 1 (Dellamaggiore Tr. 49:16-53:14); Ex. 2 (Lumma Tr. 26:24-28:6, 67:22-72:10); Ex. 31; Ex. 32. During the Outages, there was a serious lack of top-down coordination amongst the senior management level of Robinhood, resulting in a scattered effort within Robinhood to tackle individual

projects. Instead of a cohesive or coordinated response, senior management jockeyed for leadership while engineers took it upon themselves to investigate and "troll the internet" for solutions to the Outage. Ex. 33.

Finger pointing started even as Robinhood scrambled to understand the root cause and resolve the Outages. On March 2, Mr. Mayank Agarwal, Senior Engineering Manager at the time of the Outages, first attempted to lead Robinhood's response. Ex. 6 (Agarwal Tr. 31:14-22). Ms. Denali Lumma, then Director of Engineering, asked Mr. Agarwal to step aside so she could lead the response. Ex. 2 (Lumma Tr. 102:19-103:3); Ex. 6 (Agarwal Tr. 32:5-16). Mr. Adam Wolff, then VP of Engineering, subsequently wrestled leadership from Ms. Lumma. Ex. 2 (Lumma Tr. 132:17-133:15, 160:19-25); Ex. 5 (Wolff Tr. 46:7-47:6, 134:24-135:21. Each were dissatisfied with the performance of the others while engineers criticized the lack of direction. Ex. 10 (Fatehpuria Tr. 120:13-125:8); Ex. 34 at RH_OT_CIV_000072921 ("the eng[ineers] call is a mess"). Meanwhile, the engineers circulated their preference for a fourth candidate. Ex. 3 (Linford Tr. 165:15-166:9, 185:24-186:11); Ex. 34 at RH_OT_CIV_00017921.

While their customers suffered, Robinhood's engineers who had already flagged the file descriptor issue with Kafka were either laughed at or ignored. Ex. 6 (Agarwal Tr. 27:9-37:5); Ex. 35 at RH_OT_CIV_00008952 ("People laughed at me, shockingly, when I said we should focus on kafka and order executions."). One of the engineers suggested raising the file descriptor limits mere hours into the Outage at 11:40 a.m. on March 2. Ex. 36 at RH_OT_CIV_00016186-88 ("i just want to remind that i pointed out the kafka file descriptors issue on monday and nobody cared lol."). One of Robinhood's original employees, Tom Linford, took to getting high and interrupted the all-hands meeting multiple times. Ex. 3 (Linford Tr. 20:7-21, 31:14-19, 185:2-2-23, 187:1-188:4, 194:2-198:8, 200:11-206:5); Ex. 34 at RH_OT_CIV_00017958-65 ("a bit high rn [right now]."); "(no other way to survive this)"; ("do you think anyone could tell???"). Realizing the seriousness of the Outages and anticipating regulatory investigations, Robinhood's Chief Compliance Officer recommended a company-wide Slack channel titled "Shitposting" be "killed" to no avail. Ex. 4 (Castelly Tr. 108:4-110:11); Ex. 37 at RH_OT_CIV_00014000 ("Hey, I think we need to kill shitposting…there was some concern that things said there during the outage would be misconstrued if ever compelled to

produce.").

**D.** **Robinhood Had a History of Outages and Was Aware of the Deficiencies that Materially Contributed to the Outages in March 2020**

Robinhood experienced an astonishing number of outages, including admittedly potentially "company-ending" outages in December 2018 and March 2020. Ex. 30. Many of Robinhood's flaws that led to the Outages were already known and insufficiently addressed. "In the recent past, there has been the failure to launch the checking account, the 12/12/2018 incident" and in addition, "there are many ongoing known risks posing an equal or greater risk to the firm in the 10s and potentially 100s." Ex. 42 at RH_OT_CIV_ 00011962. Internal investigation at Robinhood demonstrated "clear signals showing poor system health." *Id.* Even Robinhood's previous VP of Engineering testified that the Outages were preventable. Ex. 5 (Wolff Tr. 151:15-23); Ex. 30; Ex. 43 (discussing problems with Consul outages in 2019), Ex. 44 (at least two prior Consul outages occurred in 2018 and 2019).

Robinhood identified that the Consul system, a bedrock of its infrastructure, was a serious risk back in May or June of 2019. Ex. 1 (Dellamaggiore Tr. 40:11-41:2); Ex. 43. Robinhood had almost a year to correct the problems before the Outages took place in March. Even though Consul was known as a single point of failure ("SPOF"), meaning that if Consul crashed, Robinhood anticipated a large blast radius which would have a significant impact on the rest of Robinhood's systems, Robinhood failed to take this seriously. Ex. 18 at RH_OT_CIV_00017231. Consul was known to "go into weird states during outage scenarios" and at prior "Consul-related SEVs (Oct) where we noticed similar patterns of services overloading consul." Ex. 6 (Agarwal Tr. 45:18-48:20); Ex. 18 at RH_OT_CIV_00017231. Robinhood created the Unbound DNS Project to resolve this risk to Consul in July 2019 yet assigned only one full time employee to work on this project. Ex. 1 (Dellamaggiore Tr. 124:15-127:7).

Robinhood anticipated that Consul could recover quickly if there was downtime during trading hours. An outage due to Consul's failure would be "very bad but not the end of the world for Robinhood." Ex. 1 (Dellamaggiore Tr. at 41:10 to 42:1). Robinhood had little basis for this optimistic projection because Robinhood did not perform the necessary stress tests to understand the impact of a Consul failure. *Id.* Had Robinhood properly performed testing, the Outages could have

been prevented. Declaration of Peter Vinella ("Vinella Decl."), Ex. B at ¶¶128-32. Robinhood's reason for not testing Consul prior to the Outages was attributable to its bad habit of cutting corners—the endeavor was difficult and required investment into Robinhood's infrastructure. Ex. 1 (Dellamaggiore Tr. 40:4-43:19).

It was only during the Outages that Robinhood realized it never formalized its relationship with HashiCorp, the company that developed Consul, who could have provided input and service on recovery. Ex. 3 (Linford Tr. 132:19-24, 191:9-193:5); Ex. 5 (Wolff Tr. 152:12-153:3). Enhanced Read Scalability is one of the services offered through the paid version of Consul, which would have been helpful to Robinhood during the Outages. Ex. 45 at RH_OT_CIV_00015736; Ex. 46. Even Robinhood's own engineers were appalled by this oversight. Ex. 34 at RH_OT_CIV_00017937 ("[T]here's a paid option and we don't pay for it/[sic] are we dumb"). To make matters worse, Robinhood implemented a "pretty nasty" circular dependency between Consul and another HashiCorp product called Vault that contained database passwords and each needed the other to "initially spin up," thereby complicating recovery efforts. Ex. 18 at RH_OT_CIV_00017228; Ex. 3 (Linford Tr. 174:6-176:21, 180:2-11); Ex. 38 at RH_OT_CIV_00016143-44, Ex. 33 at RH_OT_CIV_00015971; Ex. 6 (Agarwal Tr. 58:8-17, 66:11-20); Ex. 7 (Shahi Tr. 113:12-114:18), Ex. 47 at RH_OT_CIV_00016136.

**E. Robinhood will Continue to Have Outages Due to Its Weak Infrastructure and Prioritization of Product Development and Profit Over Sound Operations**

**1. Robinhood's Infrastructure Does Not Conform to Industry Standard**

Robinhood's former Director of Engineering testified that Robinhood had a "deeply unsound and unstable system." Ex. 2 (Lumma Tr. 64:13-24). Robinhood's engineers agree: "We need a stronger infrastructure team at Robinhood. It's a small team and not everyone on that team is competent." Ex. 48. At the time of the Outages, Robinhood failed to use proper testing and staging environments in accordance with generally accepted industry customs, practices, and standards of care. Vinella Decl., Ex. B at ¶106. Robinhood did not have a "Load and Fault Testing Team" until after the Outages. Ex. 19 at RH_OT_CIV_00059714.

[REDACTED] Ex. 12 (Rule 30(b)(6) Agarwal Tr. 87:22-92:10, 95:17-96:20); Ex. 49 at RH_OT_CIV_00020750 [REDACTED]

A year after the Outages, Robinhood's Chief Technology Officer still could not identify any new or updated written load testing protocols at the company. *Id*. Yet, Robinhood overrepresented to FINRA regulators that the Load and Fault Testing Team allegedly identifies "critical systems and services, and to systematically stress systems to locate and mitigate potential vulnerabilities." Ex. 12 (Rule 30(b)(6) Agarwal Tr. 100:12-102:2); Ex. 19 at RH_OT_CIV_00059714. The reality fell well short of Robinhood's aspirations to FINRA.

Robinhood's system design was so fragile that a single programming error could lead to an outage. [REDACTED]

### 2. Robinhood's Conflicting Priorities Place Profit and Development of New Features Ahead of Strengthening of Their Already Existing Systems

The Outages showcased Robinhood's steadfast prioritization of flashy customer facing components over stable infrastructure. Conversations between Robinhood employees revealed their concerns that Robinhood is hyper-focused on development and does not dedicate resources to maintaining or improving its already developed systems. [REDACTED]

████████████████████████████████████ Engineers tasked with "owning" systems have little time to work on them and are instead pulled into developing new ideas. Ex. 36 at RH_OT_CIV_00016190-191 ("I don't know a lot about consul but my team owns it heh…ya it's a bigger issue – we need to shift the balance between product/feature work and these less visible investments."). Ex. 48 ("Ownership of these core services: Kafka, Vault, Consul and Zookeeper is weak and the understanding of these systems is minimal."). Despite the numerous outages, Robinhood's focus remains on growth over system safety.

### F.    Robinhood Silences Incongruent Opinions that Stray from Robinhood's "Cowboy Culture"

Vlad Tenev and Baiju Bhatt founded Robinhood in 2013 with no retail brokerage experience, armed only with the funding-driven mindset of Silicon Valley tech startup owners.[6] Almost a decade later, that corporate culture has endured. Ms. Lumma testified to Robinhood's "cowboy culture" where "people are very egotistical and think they can do anything and really enjoy kind of the hero mode of essentially acting like cowboys as opposed to acting like professionals following best practice and, you know, standard process." Ex. 2 (Lumma Tr. 116:2-13); Ex. 6 (Agarwal Tr.27:9 - 37:5); Ex. 35 RH_OT_CIV_00008953 ("The culture here is really f'ed up all the way up to be honest."). This puts a disturbing twist on an underlying reason for Robinhood's numerous outages – engineers experience a hero moment tackling a crisis.

Robinhood engineers regularly fostered an egotistical culture that caused "people thinking like or feeling as though they were better than decades of research and iteration and craftsmanship that been evolved, you know, since before they were even in diapers." Ex. 2 (Lumma Tr. 117:15-24). In fact, Robinhood engineering staff had a practice of writing in "YOLO", abbreviated for "You Only Live Once" in code to avoid properly notating their work. Ex. 2 (Lumma Tr. 54:15-55:20); Ex. 5 (Wolff Tr. 123:7-124:11). The lack of professionalism in Robinhood's engineers extended to lying about their credentials. During one deposition it was discovered that an engineer committed

---

[6] https://www.businessupside.com/2021/03/18/robinhood-markets-inc-a-case-study/ (last accessed October 21, 2021).

resume fraud, lying that he had obtained a *dual* bachelor's degree in "Business Administration and Computer Science" when he had only graduated high school. Ex 10 (Fatehpuria Tr. 36:7-38:5); Ex. 51. Despite this blatant resume fraud, he remains at Robinhood today.

Robinhood's culture left little room for those who wanted to enact or even suggest improvements. Prior to the Outages, Ms. Lumma recognized the risks associated with and lack of professionalism for Robinhood to depend on Slack as its main form of communication with employees, especially when popular channels include "Shitposting." Ex. 2 (Lumma Tr. 59:24-60:10). She formalized her concerns into a thesis that she submitted to Vlad Tenev, and never saw again. Ex. 2 (Lumma Tr. 60:11-61:4). Ms. Lumma saw a "wake up" moment for Robinhood after the Outages and seized it to call attention to areas needing improvement. Ms. Lumma's report, titled "Outage as Opportunity," was one of the only documents that analyzed the broader issues at Robinhood causing/contributing to the Outages aside from the SEV reports. Ex. 52. Instead of supporting her goal to learn a lesson from the Outages and improve key weaknesses, Robinhood fired her.

G. **Robinhood's Senior Management is Woefully Unprepared to Operate a Securities Firm with Millions of Clients**

Setting aside the founders' lack of brokerage experience, they built their team out with unqualified personnel. At the time of the Outages, none of Robinhood's engineering management team had experience working at a registered broker-dealer, much less managing one. Robinhood's Director of Engineering (and newly minted Chief Technology Officer), Mayank Agarwal, worked at a small startup called Farm Logs before Robinhood that "provided software for corn and soybean farmers in the Midwest." Ex. 6 (Agarwal Tr. 16:1-20). Ignoring his own lack of experience and Robinhood's failures, Mr. Agarwal testified that "Robinhood's engineering team is more capable and stronger that other brokerages." Ex. 6 (Agarwal Tr. 55:18-57:58:7). Mr. Wolff also lacked brokerage industry experience but at least admitted it would have been helpful: "Finance is a complex domain, one that takes a little to learn." Ex. 5 (Wolff Tr. 76:20-78:1). Mr. Wolff's training consisted of only compliance programs "every quarter or so." *Id*. Ms. Lumma also had no financial industry experience and testified that "brokerage experience was not a focus on how we approached

- 11 -

Case No. 3:20-cv-01626-JD
NOTICE OF MOTION; MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

hiring." Ex. 2 (Lumma Tr. 37:19-38:25); *see also*, Vinella Decl., Ex. B at ¶¶87-94. Robinhood also did not have a Chief Technology Officer until *after* the Outages occurred and Mr. Agarwal only meets with Robinhood's President and COO "about once a month." Ex. 6 (Agarwal Tr. 23:11-26:13); Ex. 11 (Rule 30(b)(6) Dusseault Tr. 97:3-98:20, 142:12-143:23).

Only two of Robinhood's senior executives (Mr. David Dusseault, President and Chief Operating Officer of Robinhood Financial, and Mr. Jim Swartwout, President and Chief Operating Officer of Robinhood Securities) had any such prior experience and none the size of Robinhood. Ex. 8 (Dusseault at 5:2-10:12); Ex. 9 (Swartwout at 11:7-14:15:8). Mr. Swartwout joined Robinhood in April 2019 while Mr. Dusseault joined Robinhood in December 2019. *Id.*, *see also* Vinella Report Decl., Ex. B at ¶87. Chief Compliance Officer John Castelly, who had little relevant experience, and none at a retail brokerage, did not even know how many customers Robinhood had during his tenure or Robinhood's volume of trading. Ex. 4 (Castelly Tr. 17:16-18:18, 30:21-32:10); Vinella Decl., Ex. B at ¶88 n.58.[7]

When deposed in March 2021, Mr. Dusseault still did not know the governing FINRA rules regarding Written Supervisory Procedures ("WSP"), did not know how often Robinhood's WSPs were updated, and did not know the operative WSPs in effect at the time of the outages. Ex. 11 (Rule 30(b)(6) Dusseault Tr. 99:9-103:14); Vinella Decl., Ex. B at ¶93. It was not until after the Outages that Robinhood began a "risk operating committee" although Mr. Dusseault testified it focused on new products and *excluded* IT management despite the now clear history of severe technology risks in the firm. Ex. 11 (Rule 30(b)(6) Dusseault Tr. 95:19-98:20).[8] Yet, in correspondence to FINRA just months before Mr. Dusseault's deposition, Robinhood told FINRA that the exact same "Risk & Operating Committee" established in July 2020 "also reviews updates to Robinhood's platform and formally approves major technology changes." Ex. 19 at

---

[7] Robinhood's years' long deception of investors also led to a $65 million settlement with the SEC in December 2020. *See* https://www.sec.gov/news/press-release/2020-321, last accessed October 21, 2021.

[8] Q: "Does that committee have any duties, responsibilities, or oversight over IT management? A: No. Q: Is there an operational risk committee that does oversee IT management and risk related issues? A: No. There's no committee."

Case No. 3:20-cv-01626-JD

RH_OT_CIV_00059712. This discrepancy casts doubt on the veracity of Robinhood's representations to FINRA that it would bring itself into compliance.

**H.     Robinhood's Lack Governance Violated FINRA Regulations and Contributed to the Outages**

On June 30, 2021, Robinhood submitted its Letter of Acceptance, Waiver, and Consent ("AWC") to FINRA consenting to FINRA's findings of violations and its order to pay $69 million. Ex. 54. Part of FINRA's action stemmed from Robinhood's "series of outages and critical system failures between 2018 and late 2020" and because "these outages persisted despite two warnings from FINRA that the firm was not reasonably supervising its technology." Ex. 54 at 4. Critical to this case—FINRA expressly found that Robinhood's failure to reasonably supervise its operations and maintain the technology it relied upon to provide core broker-dealer services violated FINRA Rules 3110 and 2010. *Id.* Additionally, under FINRA Rule 4370, Robinhood failed to create a reasonably designed business continuity plan ("BCP"), which was not reasonably designed to meet the firm's obligations to customers during a significant business disruption that included the Outages. Ex. 54 at 4-5.

Prior to the FINRA AWC, Plaintiffs' expert, J. Bradley Bennett ("Bennett"), FINRA's former Chief of Enforcement from 2011 to 2017, issued his report in this case consistent with FINRA's interpretation that Robinhood violated Rule 4370 by failing to have a BCP that would have applied to and mitigated the March 2-3 Outage. *See* Bennett Decl., Ex. A. Mr. Bennett opined that Robinhood "did not properly account for the risks inherent in its unique business model as required by FINRA" because Robinhood's "BCP and Supervisory Procedures did not reasonably address the risks to its business and customers from the March 2 and 3 outages because they failed to provide alternatives means of entering orders or any avenue of meaningful communication about their accounts." *Id.* at ¶¶59-60. Robinhood's five-page BCP, operative at the time of the Outages, fell well short of this standard and was grossly insufficient to meet FINRA's requirement. *Id.* at ¶60; *see also* Ex. 55. During the investigation, Robinhood also admitted to FINRA that its WSPs were not keeping up with the growth of its business and employees who were underqualified were running operations at Robinhood. Ex. 19 at RH_OT_CIV_00059713-15.

Notwithstanding what Robinhood told FINRA, the President/COO of Robinhood Financial, could not recall the ongoing FINRA investigation during his deposition, and remained dismissive of FINRA's concerns regarding Robinhood's March 2020 outages that ultimately led to the $69 million in sanctions. Ex. 11 (Rule 30(b)(6) Dusseault Tr. 54:16-55:7, 129:6-131:15, 138:17-140:25, 155:1-157:6 ("Q. Do you agree with FINRA's view? A. No. Q. Does it concern you that FINRA was expressing those views? A. I don't agree with the views, so it didn't concern me.") (objections omitted); Vinella Decl., Ex. B at ¶¶93-94. Robinhood's dismissive attitude towards regulators, including disregarding FINRA's repeated warnings and findings is evidence of a dangerous company that pays little heed to risk at the expense of its customers.

## III.  ARGUMENT

### A.  Legal Standard, Proposed Class Definition, and Choice of Law

Plaintiffs seeking class certification must provide facts sufficient to satisfy the requirements of Rule 23(a) and at least one of the prongs of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(a) requires Plaintiffs to demonstrate: (1) numerosity; (2) commonality of the factual and legal issues; (3) typicality of Plaintiffs' claims and defenses to those of the class; and (4) adequacy of Plaintiffs and their counsel. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Here, Plaintiffs seek certification of their injunctive and declaratory relief claims under Rule 23(b)(2) and their damages claims under Rule 23(b)(3) on behalf of a class defined as: "All Robinhood account holders within the United States with a funded account and at least one equity or option position during the Outage on March 2, 2020 (the "Class")." In addition, or in the alternative, Plaintiffs seek certification of sub-classes comprised of Robinhood's account holders in the United States who: (1) closed a position on March 3, 2020, at a loss relative to the VWAP during the March 2 and 3, 2020 Outages ("VWAP Subclass"); (2) held SPDR S&P 500 ("SPY") options expiring on March 2, 2020 and experienced a loss relative to the VWAP during the March 2, 2020 Outage ("SPY Option Subclass"); (3) who experienced a failed equity trade during the Outages at a loss relative to the price at the end of the Outages and/or the transaction price obtained through March 4, 2020 and/or March 10, 2020 ("Failed Trade Subclass"); (4) held Gold membership subscriptions during the Outages ("Gold Subclass"); and (5) paid margin interest fees

during the Outages ("Margin Subclass").

Plaintiffs seek class certification on each of the claims set forth in the Second Amended Consolidated Complaint ("SAC") filed June 30, 2021 (ECF No. 120): Count I - negligence; Count II - gross negligence; Count III - breach of fiduciary duty; Count IV - breach of contract; Count V - breach of the implied covenant of good faith and fair dealing; Count VI - violations of the California Unfair Competition Law's unlawful and unfair prongs, Bus. & Prof. Code §§17200, *et seq.*; Count VII - unjust enrichment; and Count VIII - declaratory relief. SAC, ECF No. 120 at ¶¶183-228. Each of Plaintiffs' claims will be determined under California law, as set forth in the applicable Robinhood Customer Agreement at the time of the Outages. Ex. 13 at ¶36; Ex. 11 (Rule 30(b)(6) Dusseault Tr. 20:17-21:17).

### B. Plaintiffs' Case Satisfies Rule 23's Requirements

#### 1. The Proposed Classes are Sufficiently Numerous

Plaintiffs' proposed Class contains approximately 6.82 million Robinhood account holders with Subclass from ███████████ members. Walster Decl., Ex. C at ¶36; Fed. R. Civ. P. 23(a)(1).[9]

#### 2. Plaintiffs' Are Adequate Representatives with Typical Claims

Plaintiffs are adequate representatives of the class with claims that readily satisfy the typicality standards of Rule 23. Fed. R. Civ. P. 23(a)(3) -(4). Typicality ensures that "the interest[s] of the named representative[s] align with the interests of the class." *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). The typicality requirement is "permissive" and requires only that the representative's claims "are reasonably coextensive with those of the absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (internal quotation omitted). Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). The Ninth Circuit set a two-prong test for this requirement: "(1) do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

Case No. 3:20-cv-01626-JD

NOTICE OF MOTION; MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Each of the Plaintiffs has submitted a declaration herewith attesting to their experiences with the Outages and their work performed on the case, which has included the production of documents, responding to interrogatories, staying current on case related developments. *See* App'x. of Plaintiffs' Declarations. Many Plaintiffs also sat for depositions and subjected their personal electronic devices for the collection of data. *See, e.g.*, App'x. Gwaltney ¶11(g), Heidari ¶11(g), Jones, ¶11(g), Jones, ¶11(g), Mahrouyan, ¶11(g), Rao ¶11(g), Russell ¶11(g), Steinberg ¶11(g), Ward ¶11(g). Each of the Plaintiffs had at least one funded position at the time of the March 2, 2020 Outage, rendering them adequate representatives of the Class. Walster Decl., Ex. 12. The only Plaintiff who did not, Jared Leith, paid Gold Membership fees during the Outages and is a proposed Gold Subclass representative. *Id.*, Ex. 12, n.1; App'x. at Leith at ¶8. At least one or more Plaintiffs' account records indicated they also experienced the losses associated with the proposed Subclasses, as demonstrated in Exhibit 12 to the Walster Report. Plaintiffs are unaware of any potential or actual conflicts with proposed class members, and they have retained counsel experienced in complex consumer and investor class action cases. Similarly, proposed Class Counsel of CPM and Kaplan Fox have demonstrated their adequacy by vigorously litigating this case on behalf of the proposed Classes against well-resourced defendants and highly competent opposing counsel and they have a strong track record of success in prior matters. Ex. 58; Ex. 59.

### 3. Common Issues of Law and Fact Predominate Plaintiffs' Case

Plaintiffs will address the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3) collectively. "As a practical matter, commonality and predominance can be assessed in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied." *Bebault v. DMG Mori USA, Inc.*, 2020 WL 2065646, at *6 (N.D. Cal. Apr. 29, 2020) (citing *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). This requires that the "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*
at 350. Commonality is satisfied by "existence of shared legal issues with divergent factual
predicates" or a "common core of salient facts coupled with disparate legal remedies within the
class." *Hanlon*, 150 F.3d at 1019. All questions of fact and law need not be common to satisfy the
rule. *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

"Rule 23(b)(3) focuses on the relationship between the common and individual issues."
*Hanlon*, 150 F.3d at 1022. Class certification under Rule 23(b)(3) is proper when common questions
present a significant portion of the case and can be resolved for all class members in a single
adjudication. *Id.* Predominance "tests whether proposed classes are sufficiently cohesive to warrant
adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).
"Rule 23(b)(3) permits certification when one or more of the central issues in the action are common
to the class and can be said to predominate ... even though other important matters will have to be
tried separately, such as damages or some affirmative defenses peculiar to some individual class
members." *Meek v. SkyWest, Inc.*, 2021 WL 4461180, at *3 (N.D. Cal. Sept. 29, 2021) (citing *Tyson
Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (internal quotations omitted).

### a. <u>Plaintiffs' Negligence Claims Should Be Certified</u>

Plaintiffs' claims for negligence and gross negligence should be certified (gross negligence
is not necessarily a separate claim but rather the degree of negligence based on egregiousness of the
conduct). *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D.
Cal. 2019) (citing *Nypl v. Crisis Prevention Inst.*, 2018 WL 4488760, at *9 (N.D. Cal. Sept. 17,
2018)); *Tuttle v. Sky Bell Asset Management, LLC*, 2012 WL 440393 (N.D. Cal. Feb. 10, 2012)
(certifying negligence claims). Among other things, Plaintiffs maintain that Robinhood had a duty
to act reasonably to take care that its customers could execute trades. *Newman v. First California
Co.*, 47 Cal. App. 3d 60, 66 (Cal. Ct. App. 1975). Robinhood departed from the standard of care by
failing to meet accepted industry standards for the design, management, and operation of its
securities trading platform. *Milliner v. Mut. Sec., Inc.*, 207 F. Supp. 3d 1060, 1065-66 (N.D. Cal.
2016). One measure of the standard of care is the rules imposed by a self-regulatory organization
("SRO") like FINRA. SRO rules "reflect the standard to which all brokers are held." *Mihara v. Dean*

*Witter & Co., Inc*. 619 F.2d 814, 824 (9th Cir. 1980); *Milliner*, 207 F. Supp. 3d at 1065–66.

FINRA has already concluded that Robinhood violated numerous rules and regulations in a manner so egregious that it justified a sanction of $69 million. Ex. 54. FINRA concluded that "Robinhood did not supervise the technology supporting its core broker-dealer business functions." Ex. 54 at 21. Bennett's expert report is consistent with FINRA's interpretation. Bennett Decl., Ex. A. Robinhood's conduct in this case is a departure from the standard of care so pronounced that its conduct is properly considered gross negligence. *See e.g., In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 799-800. Robinhood failed to take even scant care to ensure that the Outages would not occur as evidenced by prior FINRA warnings to Robinhood "of deficiencies in its supervision of technology changes." Ex. 54 at 23. FINRA already concluded Robinhood was aware of the need to improve technology governance but failed to take action. As a result, the March 2020 Outages occurred, over a year after the "watershed incident" of 2018 in which Robinhood flipped customers' put and call orders. Ex. 30. "Despite the prior repeated outages and FINRA's warning, Robinhood did not improve its supervisory system." Ex. 54 at 23. As a result, "[m]any of Robinhood's customers experienced serious financial consequences by not being able to trade during the outages." *Id*. at 21; *see also* Vinella Decl., Ex. B at ¶¶135-39.[10]

### b. Plaintiffs' Breach of Fiduciary Duty Should Be Certified

Similarly, whether Robinhood's conduct breached its fiduciary duties to the Class as set forth in Count III is a common issue. Robinhood violated its fiduciary duties by failing to put its customers' first and failing to effectuate customer orders during the Outages due to its own mismanagement and poorly designed technical infrastructure. Fiduciary duty claims are regularly certified. *Caldwell v. UnitedHealthcare Ins. Co.*, 2020 WL 7714394 (N.D. Cal. Dec. 29, 2020); *Schuman v. Microchip Tech. Inc.*, 2020 WL 887944 (N.D. Cal. Feb. 24, 2020); *Tuttle*, 2012 WL

---

[10] Robinhood also cannot disclaim its liability for gross negligence through contract. *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 (2007); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 800. Furthermore, FINRA rules cannot be disclaimed, and "any agreement releasing a broker-dealer from complying with its obligations under FINRA rules is void as a matter of law." *Milliner*, 207 F. Supp. 3d at 1070.

440393. "The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal." *Twomey v. Mitchum, Jones & Templeton, Inc*., 262 Cal. App. 2d 690, 709 (Cal. Ct. App. 1968). As a broker, Robinhood had a duty to properly take and execute its customers' trades. *Newman*, 47 Cal. App. 3d at 66; *Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb*, *Inc*, 769 F.2d 561, 567 (9th Cir. 1985). Robinhood will undoubtedly argue against a fiduciary duty and will claim it is a mere electronic brokerage that does not offer investment advice, however whether it was a fiduciary to the Class and if so, whether it breached that duty, is a common issue of law and fact. Plaintiffs' FINRA expert Bennett establishes that even electronic brokers assume duties to act in their clients' best interests. Bennett Decl., Ex. A at ¶¶53-62.

### c. Plaintiffs' Contract Claims Should Be Certified

Counts IV and V for breaches of contract and the implied good faith and fair dealing both lend themselves well to class certification. *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288 (N.D. Cal. 2020); *Maldonado v. Apple, Inc.*, 333 F.R.D. 175 (N.D. Cal. 2019); *In re Chase Bank USA, N.A. Check Loan Contract Litig.*, 274 F.R.D. 286 (N.D. Cal. 2011). Here, the operative Customer Agreement of February 5, 2020 ("Customer Agreement") with Robinhood Financial LLC, Robinhood Securities, LLC and their agents specifically agree to open an account for its customers "for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared." Ex. 13 at 1. Robinhood breached the Customer Agreement completely during the Outages by failing to perform at all as their introducing and executing brokers, which Robinhood contracted to be.[11]

Not only did Robinhood breach its Customer Agreement, but it also breached the covenant of good faith and fair dealing inherent in every contract. "The covenant of good faith and fair dealing is implied in every contract and prevents one party from 'unfairly frustrating the other party's right to receive the benefits' of the contract." *Qingdao Tang-Buy Int'l Imp. & Exp. Co., Ltd. v. Preferred Secured Agents, Inc*., 2016 WL 6524396, at *5 (N.D. Cal. Nov. 3, 2016) (citing *Guz v. Bechtel Nat'l*

---

[11] Plaintiffs also submit that Robinhood breached its corollary customer agreements governing the Gold membership program, margin accounts, and options trading. *See* Exs. 56-57.

*Inc.*, 24 Cal. 4th 317, 349 (2000)). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992). Robinhood's conduct was objectively unreasonable because it failed to take steps that would allow it to perform under the contract by failing to properly build and manage infrastructure necessary to take and process trades for its millions of customers, and it used its discretion in dangerous ways that ran afoul of regulatory requirements and deliberately undermined the intent of the parties and public policy. By causing Outages to occur, Robinhood impeded Plaintiffs and the putative Class from obtaining their benefits under the Customer Agreement and caused them harm.

### d. <u>Plaintiffs' Restitutionary Claims Should Be Certified</u>

Plaintiffs' claims under California's UCL (Count VI) and for unjust enrichment (Count VII) are certifiable and entitle them to restitution and injunctive relief. Plaintiffs allege that Robinhood violated the UCL's prohibition on "unlawful" and "unfair" conduct that entitles them to restitution and injunctive relief. Cal. Bus. & Prof. Code §§17200-203. Plaintiffs' claims that Robinhood's conduct was "unlawful" stems from its numerous violations of FINRA and SEC requirements, including the SEC's Staff Legal Bulletin No. 8 and the NASD's Notice to Members ("NTM") 99-11 that required broker-dealers to have sufficient technological trading capacity over 20 years ago, FINRA Rule 2232 and SEC's recordkeeping requirements, 17 C.F.R. §240.17a-3, by failing to maintain accurate records of accounts and trade confirmations (including attempted trades), Rule 2010, 3110, 3120, by failing to have a sufficient supervisory system over its technology, Rule 4370 which requires Robinhood to have a proper business continuity plan, and Rule 5310 which requires best execution of orders fully and promptly. "An unlawful act is one 'forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.'" *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 674 (9th Cir. 2007) quoting *Saunders v. Superior Court,* 27 Cal.App.4th 832, 838-39 (1994). Plaintiffs' tort-based negligence and breach of fiduciary duty claims also form predicate violations of the UCL's unlawful prong. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007); *Izsak v. Wells Fargo Bank, N.A.*,

2014 WL 1478711, at *6 (N.D. Cal. Apr. 14, 2014); *Hensley-Maclean v. Safeway, Inc.*, 2014 WL 1364906, at *8 (N.D. Cal. Apr. 7, 2014).

Plaintiffs also seek certification on the grounds that Robinhood's conduct was so egregious that it constitutes "unfair" conduct prohibited under the UCL. "Although there are a number of ways to satisfy the unfairness prong…[t]he balancing test asks whether the alleged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Grace v. Apple, Inc.*, 328 F.R.D. 320, 336 (N.D. Cal. 2018) (internal quotation marks and citations omitted). Here, Robinhood has no cogent argument that its conduct provided any benefit, and the gravity of the harm was severe. Similarly, Plaintiffs' claims for unjust enrichment will turn on whether they conferred benefits on Robinhood, particularly in the form of Gold membership fees and interest for services unrendered, causing Robinhood, "who has been unjustly enriched at the expense of another [to] be required to make restitution." *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal.4th 988, 998 (2015); *see also Smith v. Keurig Green Mt., Inc.*, 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) (certifying UCL and unjust enrichment claims).

### e.  Certification of Rule 23(b)(3) Damages Classes is Appropriate

Plaintiffs have undertaken an analysis of available data from Robinhood and other market data and proffered damages models that are suited to class treatment. Walster Decl., Ex. C. It is important to note as a starting point that Robinhood breached FINRA Rule 2232 by failing to record orders and send confirmations of orders (including attempted orders) during the Outages. Robinhood also violated SEC regulations that require "an itemized daily record of all purchases and sales of securities. . ." 17 C.F.R. §240.17a-3. Despite a wholesale failure to comply with its regulatory obligations, Plaintiffs sampled extensive trading data for over 40,000 Robinhood accounts both before and after the Outages, along with the limited available data captured by Robinhood's systems recorded during the Outages. Walster Decl., Ex. C.

In light of Robinhood's failure to fully capture its accounts orders, Plaintiffs' also analyzed damages from two additional perspectives: (1) damages incurred to investors at the outset of the March 2 Outage that restricted the marketability of their assets (referred to as the "ex ante"

approach); and (2) actual and realized losses by traders at the conclusion of the outages who liquidated positions at less favorable pricing than was available during the Outages or had expiring options (referred to as the "ex post" approach). *Id*., Ex. C at ¶9. Plaintiffs also calculated applicable Gold membership fees and margin interest during the Outages for the Gold and Margin Subclasses. *Id*. at ¶¶80-84, Ex. 13.

Robinhood's March 2 Outage occurred on a high-volume trading day during a volatile market and caused an immediate and calculable economic loss to traders with funded accounts of equity or options positions. "The failure of Robinhood's operating systems during the Outages resulted in temporary transfer restrictions being placed on investment positions held by Plaintiffs and the Class – which imposed an economic loss in the form of a loss of flexibility – i.e., investors were unable to make trades to capitalize gains, to mitigate losses, and alter the risk profile of their investments." *Id*. at ¶¶4, 44. These losses are "measurable" because "[o]ver the last 30 years, economic and financial experts have designed pricing formulas to measure the discount in value associated with investment positions that lack marketability. *Id*. at ¶8. This "discount of lack of marketability" ("DLOM") analysis addresses the central issue in this matter - the cost of the lost marketability the Outages imposed on the Class. *Id*. at ¶47. It recognizes that investors paid for marketable securities, that marketability was taken away by Robinhood, and that marketability has a measurable value. The concept of lost marketability is generally akin to Robinhood's pre-IPO stock grants to employees, which may have a deeply discounted market value due to restrictions on transfer or vesting periods prior to Robinhood going public. *Id.* at ¶¶38-43. By taking all of its investors out of the market for the entire day on March 2, 2020, Robinhood unilaterally restricted all of its customers' positions in a similar fashion. *Id.* at ¶¶62-66. The value of the discount can be significant. For example, the cost of one day's worth marketability for a $5,000 option investment Plaintiff Prendergast held in Tesla at the start of the March 2, 2020 Outage was $870 (17.4% of the value of the position). *Id.* at ¶56.

The raw value of losses on March 2, 2020 under this method would put the Class Members' losses at over $200 million. *Id.* at ¶62. However, that figure is adjusted downward to account for investors' propensity to trade, which is determined by examining trading activity for the two months

preceding the March 2 Outage and "using the historical relationship between trading in the sample accounts and the overall market volume of equity and option trading." *Id.* at ¶63. Plaintiffs determined that the Class members' accounts were collectively damaged by approximately <u>$13.5 million</u> on March 2, 2020, before interest and punitive damages. *Id.* at ¶65, Ex. 10. Accordingly, the "ex ante" or DLOM approach to the class wide damages is a viable method to determining the economic damage to each account on a class wide basis.

The second "ex post" part of Plaintiffs' damages analysis impacts the VWAP, SPY Option, and Failed Traded Subclasses. The damages for the VWAP Subclass look at what pricing movements took place during the Outages and what trading activity occurred after the Outages to determine whether Class Members had actual realized losses because of their inability to close positions during the Outages. *Id.* at ¶¶68-73. The benchmark for determining these losses is the "volume weighted average price" (or "VWAP") available during the March 2 Outage. *Id.* at ¶¶10, 68-71. For example, Plaintiff Prendergast sold options on March 3, 2020, in Virgin Galactic at a loss of $1,351.75 compared to the VWAP during the March 2 Outage. *Id.* at ¶¶70-71. Plaintiffs have identified 103,844 accounts with similar losses totaling <u>$12,148,378</u>. *Id.* The SPY Option Subclass is based on a similar VWAP. Those options expired completely worthless on March 2; Plaintiffs Beckman and Jones, and ███████████ "lost 100% of their investments as they could not access their accounts," totaling <u>$730,201</u> in losses. *Id.* at ¶¶72-73, Ex. 12.

The final piece of Plaintiffs' ex-post analysis is the Failed Trade Subclass representing investors who placed a trade order prior to or during the Outages that should have executed during the Outages but then failed due to the Outages. *Id.* at ¶¶74-77. "Thousands of order records appear in the data with information on the time, symbol, order type (limit/market), and order price." *Id.* at ¶74. Accordingly, Plaintiffs determined "which orders were in an economically worse position following the Outage relative to the order attempted by the customer." *Id.* In total, Plaintiffs identified failed orders that experienced losses of over <u>$7.5 million</u>. *Id.* at ¶77.

Last, Plaintiffs seek to recover portions of "Gold" membership fees that Robinhood charged 340,556 Class Members during the Outages (mostly at $5/month) at <u>$1.5 million</u>. Similarly, Class Members incurred interest fees on the Outage days of March 2, 3, and 9, on their accounts that

amounted to $287,647.[12] Accordingly, each of Plaintiffs' proposed monetary recoveries are consistent with their claims in the case, are well-supported by the available data and economic research, and do not require individualized inquires. "[S]o long as the proposed damages model is attributable to the plaintiff's legal theory of the harm, and damages can be determined without excessive difficulty," certification is warranted. *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (citing *Just Film*, 847 F.3d at 1121).

### f. Certification of Rule 23(b)(2) Injunctive Relief Class Is Appropriate

"District courts may certify both a 23(b)(2) class for the portion of the case concerning injunctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary damages." *Chinitz v. Intero Real Estate Services*, 2020 WL 7391299, at *10 (N.D. Cal. July 22, 2020) (internal quotation marks and citations omitted); *see* Newberg on Class Actions §4:38 (5th ed. 2020). Thus, "in cases where a plaintiff seeks both declaratory and monetary relief, courts may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2)." *McMillion v. Rash Curtis & Assoc.*, 2017 WL 3895764, at *10 (N.D. Cal. Sept. 6, 2017) (internal quotation marks omitted).

In addition to their UCL claim that permits injunctive relief, Cal. Bus. & Prof. Code §17203, Plaintiffs pursue Count VIII specifically for Declaratory Relief because Robinhood is not complying with its fiduciary duties and obligations under the Customer Agreement and regulatory requirements and has not and does not maintain sufficient infrastructure necessary to provide financial services in a complete and timely manner. SAC at ¶¶224-228.

It is sufficient to meet the requirements of Rule 23(b)(2) where "class members complain of a pattern or practice that is generally applicable to the class as a whole." *Rodriguez*, 591 F.3d at 1125 (quotations omitted); *see also McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). Here, a permanent injunction will implement stronger internal controls, including organizational changes, to ensure that outages no longer occur, or at the very least, occur less frequently and that Robinhood has sufficient management, redundancies, and recovery methods that limit their length and harm.

---

[12] Plaintiffs also seek punitive damages and interest, which can be calculated based on the eventual recoveries. Walster Decl., Ex. C at ¶¶85-86, Ex. 14.

Some of the Plaintiffs still maintain Robinhood accounts and they and other Class members are entitled to operational improvements and compliance programs to prevent future Outages. *E.g.*, App'x., Gwaltney ¶2, Jones at ¶2, Kuri at ¶2, Steinberg at ¶2, Xia at ¶2.

Plaintiffs have provided a comprehensive plan for equitable relief that includes operational changes to Robinhood's processes, controls, and systems and organizational changes to Robinhood's personnel. Vinella Decl., Ex. B at ¶¶140-49. For example, because Robinhood's Outages were in part due to understaffing and underqualified personnel and management, injunctive relief instating accomplished personnel is warranted. *Id*. at ¶¶87-101, 144. A few recommended organizational action items include enlisting an individual with significant technological development experience to act as head of engineering, establishing formal QA and QC control teams at Robinhood Markets, and governing future projects via a project manager supported by subject matter experts. *Id*. at ¶¶144, 146. Given Robinhood's long track record of outages, without injunctive relief there is nothing to ensure that Robinhood will change both its organizational and operational structures so that Robinhood's users will be able to trade efficiently without undue delay and unnecessary risk.

### g. Plaintiffs Satisfy Rule 23(b)(3)'s Superiority Factor

"Rule 23(b)(3) requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy, and it specifically mandates that courts consider the likely difficulties in managing a class action." *Brickman v. Fitbit, Inc.*, No. 3:15-cv-02077-JD, 2017 WL 5569827, at *8 (N.D. Cal. Nov. 20, 2017) (internal quotation marks and citations omitted). Here, any separate actions filed by Class members would likely be individual arbitrations before FINRA, which are unlikely to be economically feasible for most Class members' whose claims only range up to a few thousand dollars. To the extent that there are any such proceedings they have not impeded this litigation. Concentrating the claims in this forum supports the economies and efficiencies of adjudicating the Class members' rights collectively. Last, Plaintiffs do not foresee any manageability issues as the trial of their claims is going to be based on the same documents and testimony put forth in this Motion.

### IV. CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant their Motion.

DATED: October 22, 2021            Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**    **COTCHETT, PITRE & MCCARTHY, LLP**

/s/ *Matthew B. George*            /s/ *Anne Marie Murphy*
Matthew B. George (SBN 239322)     Anne Marie Murphy (SBN 202540)
Kathleen A. Herkenhoff (SBN 168562) Mark C. Molumphy (SBN 168009)
Laurence D. King (SBN 206423)      Noorjahan Rahman (SBN 330572)
1999 Harrison Street, Suite 1560   Tyson C. Redenbarger (SBN 294424)
Oakland, CA 94612                  Julia Peng (SBN 318396)
Telephone: 415-772-4700            San Francisco Airport Office Center
Facsimile: 415-772-4707            840 Malcolm Road, Suite 200
*mgeorge@kaplanfox.com*            Burlingame, CA 94010
*kherkenhoff@kaplanfox.com*        Telephone: (650) 697-6000
*lking@kaplanfox.com*              Facsimile: (650) 697-0577
                                   *amurphy@cpmlegal.com*
                                   *mmolumphy@cpmlegal.com*
                                   *nrahman@cpmlegal.com*
                                   *tredenbarger@cpmlegal.com*
                                   *jpeng@cpmlegal.com*